## Railway Company *v.* Alling.

## Denver and Rio Grande Railway Company *v.* Cañon City and San Juan Railway Company.

1. Where the trustees or directors of a corporation have appealed from a decree, and directed their counsel to prosecute the appeal, this court will not dismiss it on the motion of strangers to the decree who, since it was rendered, have become the owners of a majority of the stock of the corporation.

2. Such trustees or directors are in law the managers of the property and affairs of the corporation. As such they, in all litigation involving its action, represent it, its stockholders and creditors. If they violate their trust, the remedy must be sought in some court of original jurisdiction.

3. An act entitled "An Act granting the right of way through the public lands to the Denver and Rio Grande Railway Company," approved June 8, 1872 (17 Stat. 339); an act amendatory thereof, approved March 3, 1877 (19 Stat. 405); and an act entitled "An Act granting to railroads the right of way through the public lands of the United States," approved March 3, 1875 (18 Stat. 482), — considered with reference to the conflicting claims of the Denver and Rio Grande Railroad Company, and the Cañon City and San Juan Railway Company, to occupy and use the Grand or Big Cañon of the Arkansas for railroad purposes. *Held*, 1. That said act of 1872 granted an immediate beneficial easement in a particular way over which the routes designated in the charter of the Denver Company lay, capable, however, of enjoyment only when such way should actually and in good faith be appropriated for the purposes contemplated by that charter, and then the title thereto would take effect by relation as of the date of the act. 2. That that company finally appropriated the right of way through the cañon April 9, 1878, and was by its prior occupancy entitled to the benefits conferred by said act of 1872. 3 That both companies should be allowed to proceed with the construction of their respective roads through said cañon where it is broad enough for them to do so without interfering with each other; but where, in the narrow portions of the defile, this is impracticable, the court below, while recognizing and enforcing the prior title of the Denver Company, should, by proper orders, secure upon just and equitable terms the right of the Cañon City Company, under said act of 1875, to use, in common with the Denver Company, the same road-bed and track, after the same shall have been completed.

Appeals from the Circuit Court of the United States for the District of Colorado.

These causes involve the conflicting claims of two railroad corporations — the Denver and Rio Grande Railway Company and the Cañon City and San Juan Railway Company — to occupy and use the Grand or Big Cañon of the Arkansas for

railroad purposes. For the sake of brevity, the former will be hereafter designated as the Denver Company, and the latter as the Cañon City Company.

The Denver Company was incorporated in the year 1870, in conformity to the laws of the then Territory of Colorado. Its object, expressed in the articles of incorporation filed in the proper office of the Territory, was to locate, construct, operate, and maintain certain railway and telegraph lines; viz., the Denver and Rio Grande Railway, the Denver and Southern Railway, the South Park Railway, the Western Colorado Railway, the Morena Valley Railway, the San Juan Railway, the Gallesto Railway, and the Santa Rita Railway. The general route of each line was designated in the articles of incorporation. That of the main line — the Denver and Rio Grande Railway — was as follows : —

" Commencing at Denver, Colorado Territory, thence running up the valley of the South Platte River, on the southeast side thereof, to a point at or near the mouth of Plum Creek; thence up the valley of Plum Creek, to a point at or near the forks of East Plum Creek and West Plum Creek; thence up the main east branch of Plum Creek Valley to the lake in township 11, range 67 west, on the east of the ridge dividing the waters of Plum Creek and Monument Creek; thence down the valley of Monument Creek to a point at or near the junction of the valleys of the Monument and Fountain *qui bouille*, or to a point in the Fountain Valley, below the mouth of the Monument, if the detailed survey shall determine the latter to be the most eligible; thence by the valley of the Fountain or across its west tributaries to such a point on the Arkansas River at or above Pueblo as may be found upon a detailed survey to be the most eligible for intersecting the same; *thence up the valley of the Arkansas to a point at or near Cañon City; thence continuing up the valley of the Arkansas through the Big Cañon of the same to a point at or near the mouth of the Arkansas River;* thence by the valleys or the adjoining slopes of the Arkansas River and of Pueblo Creek to the summit of the divide between the waters of the Arkansas and the San Luis Park (known as Poncho Pass); thence by the most eligible route in a general southerly direction down the San Luis Valley to the valley of the Rio Grande del Norte; thence in a general southerly direction, by the particular route which may be determined upon by a detailed survey to be

most eligible, down the valley of the Rio Grande to the southern boundary of Colorado ; thence continuing down the valley of the Rio Grande, on either side of the river, as may be found expedient, or crossing from one side to the other when desirable, to El Paso, in the State of Chihuahua, with the privilege of consolidating or uniting with and operating any connecting railway in the Republic of Mexico."

The remaining seven roads are, or were intended to be, branches or feeders of the main line.

By an act of Congress, approved June 8, 1872 (17 Stat. 339), " the right of way over the public domain, one hundred feet in width, on each side of the track, together with such public lands adjacent thereto as may be needed for depots, shops, and other buildings for railroad purposes, and for yard-room and side-tracks, not exceeding twenty acres at any one station, and not more than one station in every ten miles, and the right to take from the public lands adjacent thereto stone, timber, earth, water, and other material required for the construction and repair of its railway and telegraph line," was granted and confirmed unto the Denver Company, its successors and assigns. The act describes the company as a corporation created under the incorporation laws of the Territory of Colorado, and grants, ratifies, and confirms to it all the rights, powers, and franchises conferred by those laws on corporations created thereunder for constructing and operating railroad and telegraph lines, for the extension and operation of its railway and telegraph lines in and through any contiguous territory of the United States, to the northern boundary line of Mexico, subject to the conditions and requirements of the territorial statutes so far as the same were applicable and not inconsistent with the laws of the United States. The act, also, gave to the company the rights, powers, and privileges conferred upon the Union Pacific Railroad Company by sect. 3 of the act of July 2, 1864. But the rights thus granted and conferred were accompanied by the proviso that the company should complete its railway to a point on the Rio Grande as far south as Santa Fé, within five years after the passage of the act ; and complete each year thereafter fifty miles additional south of that point.

By an act approved March 3, 1875 (18 id. 576), that of
June 8, 1872, was corrected by adding thereto a proviso, which
was declared to have been omitted by mistake of the copyist.
That proviso enacts, among other things, that the "Denver
and Rio Grande Railway Company is hereby recognized as a
lawful corporation from the date of its incorporation under the
laws of Colorado, and all the powers, privileges, and franchises
by said laws conferred upon said company are hereby expressly
ratified, confirmed, and legalized as existing from the said date
of incorporation."

On the same day, Congress passed an act " granting to rail-
roads a 'right of way through the public lands of the United
States.'"   18 Stat. 482.   It grants that right to any railroad
" company duly organized under the laws of any State or Terri-
tory, except the District of Columbia, or by Congress, which
shall have filed with the Secretary of the Interior a copy of
its articles of incorporation, and due proofs of its organization
under the same, to the extent of one hundred feet on each side
of the central line of said road ; also the right to take from the
public lands adjacent to line of the road, material, &c., neces-
sary for the construction of the road, and grounds for station
buildings, depots, machine-shops, side-tracks, turn-outs, and
water stations," &c.

The second section provides : —

" That any railroad company whose right of way, or whose track
or road-bed upon such right of way, passes through any cañon,
pass, or defile, shall not prevent any other railroad company from
the use and occupancy of said cañon, pass, or defile, for the pur-
poses of its road, in common with the road first located, or the
crossing of other railroads at grade.   And the location of such
right of way through any cañon, pass, or defile shall not cause the
disuse of any wagon or other public highway now located therein,
nor prevent the location through the same of any such wagon road
or highway where such road or highway may be necessary for the
public accommodation; and where any change in the location of
such wagon road is necessary to permit the passage of such rail-
road through any cañon, pass, or defile, said railroad company shall,
before entering upon the ground occupied by such wagon road,
cause the same to be reconstructed at its own expense in the most

favorable location, and in as perfect a manner as the original road: *Provided*, that such expenses shall be equitably divided between any number of railroad companies occupying and using the same cañon, pass, or defile."

Section 4 declares that any railroad company desiring to secure the benefits of that act shall, "within twelve months after the location of any section of twenty miles of its road, if the same be upon surveyed lands, and, if upon unsurveyed lands, within twelve months after the survey thereof by the United States, file with the register of the land-office for the district where such land is located, a profile of its road; and upon the approval thereof by the Secretary of the Interior," the same was required to "be noted upon the plats in said office, and thereafter all such lands over which such right of way passes should be disposed of subject to such right of way." All rights thereby granted to be forfeited as to any section located but uncompleted within five years after such location.

On Feb. 15, 1877, Alling, Locke, and Megrue became incorporated under the laws of Colorado as "The Cañon City and San Juan Railway Company," with a capital stock of $100,000, for the purpose of constructing and maintaining a railroad from Cañon City, thence up the valley of the Arkansas River through the Grand Cañon thereof, thence, by the most practicable route, following that river to South Arkansas post-office in Lake County, Colorado. The articles of incorporation were filed in the office of the Secretary of State of Colorado, Feb. 19, 1877. The Secretary of the Interior, in an official communication, declared, June 22, 1877, his approval of the proofs of organization filed by that company, and of the map showing the line of its road for a distance of twenty miles.

Congress, March 3, 1877, passed an act amending that of June 8, 1872, so as to read that the Denver Company should have ten years, from the passage of the original act, to complete its road as far south as Santa Fé, in default of which, as to the unfinished part of it, the rights and privileges granted should be null and void.

The Cañon City Company filed, April 20, 1878, its complaint against the Denver Company, in the Third Judicial District

Court of Colorado, Fremont County, claiming that it had complied, in all respects, with the act of Congress of March 3, 1875, and acquired a prior right to construct its road through the Grand Cañon, one hundred feet on each side of its line as surveyed in 1877, and charging that the defendant was interfering with the construction of its road upon that line.

In accordance with the prayer of the bill, an injunction was granted by the State court restraining the defendant from interfering with its further operations in the cañon. That suit, upon the petition of the defendant, was, April 22, 1878, removed into the Circuit Court of the United States for the District of Colorado.

The Denver Company, April 27, 1878, filed its bill in the latter court, against Alling and others, who are designated in the charter of the Cañon City Company as its trustees for the first year, and against the Atchison, Topeka, and Santa Fé Railway Company, charging that the Cañon City Company was not a legally constituted corporation; that the individual defendants, wrongfully claiming to be such corporation, had, by force, occupied the Grand Cañon, and were proceeding to locate their road upon a line in that cañon which the complainant had surveyed in 1871–72, and upon which it had made preparations to resume active work on the 19th of April, 1878; that, although it was in the occupancy of the narrow portion of the cañon, where only one road could be located, the defendants threatened by force to drive away its engineers and servants then working in said cañon, and thereby dispossess it of its located line and grade in the narrow part of said cañon; that the defendants were aided and abetted in said course by the Atchison, Topeka, and Santa Fé Railway Company, who, seeking to build a road from Pueblo, by the valley of the Arkansas, and through said cañon, had to that end confederated with the defendants to compel the complainant to abandon the extension of its railway as authorized by its charter and the act of Congress. The complainant, by its bill, claimed an exclusive right of way through the Big Cañon, upon the line of its survey, and one hundred feet upon each side of its road, and to that effect relief was asked by final decree. In that suit a temporary injunction was granted against the Cañon City Company, restraining it

from occupying or attempting to occupy the Big Cañon, and from, in any way or manner, constructing or attempting to survey, locate, or construct their line of railroad through the cañon, which, for the purposes of that suit, was taken and decreed to begin at what is known as the "Point of Rocks," at the mouth of the cañon, and extending to the twelve-mile bridge. That injunction was subsequently modified and limited in its operation to that part of the cañon known as the Royal Gorge, and the defendant was allowed to enter upon that part of the cañon and grade the same for a railroad, but not to lay ties or rails on any part thereof until the future order of the court.

In the suit instituted by the Cañon City Company, the Denver Company filed a cross-bill, setting up substantially the same facts as in its original bill against Alling and others, and a decree was rendered, which, among other things, recognized the prior right of the former to proceed in the construction and operation of its road through the Grand Cañon, without interference or obstruction, in any way, by the Denver Company, but with liberty to the latter to exhibit its bill in any court of competent jurisdiction to compel the Cañon City Company to so change, locate, and construct its road as to permit the convenient and proper location by the Denver Company of its own road, or to compel the Cañon City Company to permit the Denver Company to occupy the track and roadway of the former company, if at any point in that defile it should be impracticable to conveniently lay down or safely operate two distinct lines of railway. From that decree the Denver Company appealed, and it also appealed from the decree in its own suit, dissolving the preliminary injunction granted to it, and dismissing its bill.

The case was submitted on printed arguments by *Mr. John P. Usher*, *Mr. Hanson A. Risley*, and *Mr. James Grant* for the appellants, and by *Mr. H. M. Teller* and *Mr. Charles E. Gast* for the appellees.

The motions, made after the submission of the case, which are mentioned in the opinion of the court, were argued by *Mr. Sidney Bartlett* and *Mr. E. R. Hoar* in support of them, and by *Mr. Lyman K. Bass* and *Mr. James Grant, contra.*

MR. JUSTICE HARLAN, after stating the case, delivered the opinion of the court,

A preliminary question, presented for our consideration, must be first disposed of.

These causes were determined in the Circuit Court, by final decree, Aug. 24, 1878. Upon stipulation between the parties they were submitted here on the 10th of January last. On the 20th of January it was represented to this court, in proper form, that the Pueblo and Arkansas Valley Railroad Company owned a railroad which, with its branches and extensions, is a continuation, in Colorado, of the line of the Atchison, Topeka, and Santa Fé Railroad Company in Kansas; that certain contracts and arrangements had, with the consent of the appellees in both suits, and after the filing of that stipulation, been entered into between the Denver Company, the Atchison, Topeka, and Santa Fé Railroad Company, and the Pueblo and Arkansas Valley Railroad Company, and had been in part executed after the filing of the printed arguments herein; that by said contracts and arrangements the Atchison, Topeka, and Sante Fé Railroad Company had taken a lease of all the constructed lines of the Denver Company for thirty years from Dec. 1, 1878, and was then in the possession of and operating them; had purchased and received all the railroad supplies and materials of that company; had purchased and transferred to a trustee for its use a majority of all the shares of the capital stock of that company, with an agreement providing for a further purchase and ownership of the remainder of them, and with the further agreement that the Pueblo and Arkansas Valley Railroad Company and the Atchison, Topeka, and Sante Fé Railroad Company should have the selection of a majority of the directors of the Denver Company, the other third being selected by the bondholders of the latter company; that those contracts and agreements were made with the intent and design of ending all controversies, and especially all competitive construction of railroad lines, between the Denver Company on the one part, and the Atchison, Topeka, and Santa Fé Railroad Company and the roads operated by it, including the Pueblo and Arkansas Valley Railroad Company, on the other part; that, by reason of the premises, the Atchison, Topeka,

and Santa Fé Railroad Company, in its own right, and in connection with the Pueblo and Arkansas Valley Railroad Company, had become and was equitably the owner and entitled to the control of all the affairs, suits, interests, and property of the Denver Company, and especially to the discontinuance of all litigation hostile to the interests of the Atchison, Topeka, and Santa Fé Railroad Company and the Pueblo and Arkansas Valley Railroad Company. Upon these grounds the Pueblo and Arkansas Valley Railroad Company (the present name of the Cañon City Company), and Alling and others, appellees, moved the court that the stipulation for the submission of these causes, upon printed arguments, be cancelled and discharged, such printed arguments withdrawn from the files, and the appeals dismissed. Upon the part of the Atchison, Topeka, and Santa Fé Railroad Company a motion was submitted that it be allowed to intervene and take charge of these suits in the name of the Denver Company, and appear by its solicitor, on behalf of the appellants, that it may give consent, of record, to the dismissal of the appeals. The trustee referred to in the alleged contracts gave his consent to the motions, and their hearing was set for the 20th of March, this court, in the mean time, suspending any action upon the appeals. At that date the Denver Company appeared by its attorneys and resisted each motion.

Upon the hearing of the motions it appeared, among other things, that on the first day of March, 1879, the Denver Company had issued 85,000 shares of stock, of which the plaintiffs in the motions claimed to own or control a bare majority, — 42,510 shares. It was also shown that, at a meeting of the directors of the Denver Company, held on Feb. 7, 1879, a quorum being present, resolutions were unanimously adopted, declaring that these motions were hostile to the interests of that company; that the claims of the Atchison, Topeka, and Santa Fé Railroad Company and the Pueblo and Arkansas Valley Railroad Company were unfounded, and their assertion for the fraudulent purpose of depriving the Denver Company, its stockholders and creditors, of valuable rights, interests, and property, without compensation. The resolutions instructed the president and the attorneys of the company not only to

oppose these motions, but, by all legal means, prevent the dismissal of these appeals, or the intervention herein for any purpose of any company or person not a party to the record. They were also required to prosecute the appeals in this court with the utmost diligence. At the argument of the motions, copies of all the contracts, resolutions, and writings relied upon by the respective parties were submitted for our examination. Upon careful consideration of the suggestions of learned counsel, we do not doubt that it is our duty to decline any expression of opinion as to the effect or proper construction of the numerous documents which, it is claimed, give the plaintiffs in the motions the right to have the appeals of the Denver Company dismissed. It is apparent that there are serious differences among the stockholders of that company, not only as to its general policy in the future, but as to the validity and interpretation of the contracts and writings under which the Atchison, Topeka, and Santa Fé Railroad Company and the Pueblo and Arkansas Valley Railroad Company claim to be equitably the owners, and entitled to the control of the affairs, property, and suits of the Denver Company. We cannot now enter that field of controversy. The present appeals are being prosecuted to final judgment by order of the directors or trustees of the appellant corporation. To them, by law, is committed the management of the property and concerns of the corporation. In all litigation involving the action of the corporation they are its representatives in court. In the discharge of their duties they represent not only the stockholders, but the bondholders and creditors, of the company. Their right, while in the exercise of their legitimate functions, to manage the affairs and suits of the company, ought not to be controlled or interfered with by this court, by reason of any thing which appears upon the pending motions. Upon their responsibility as directors and trustees they insist that these causes shall proceed to final judgment, in accordance with the stipulation heretofore made by the parties to the appeals. If, in prosecuting them to final judgment, they violate any trust committed to their hands, or any agreement which is binding upon the corporation and the minority stockholders, remedy may be sought in some court of original jurisdiction, into which, upon proper

pleadings, all persons interested may be summoned. No such proceeding has been instituted, so far as we are informed, and we do not feel at liberty, upon the suggestion of strangers to the decrees appealed from, to go behind the official action of the board of directors or trustees, and, in plain disregard of their wishes, and their directions to counsel, dismiss the appeals, and thereby refuse to consider questions regularly presented for our determination.

The motions are, therefore, denied, and we proceed to an examination of the cases upon their merits, premising that our present duty is limited to a determination of the rights of the parties as they existed when the final decrees were rendered, and as they are manifested in the records before us. If, since these decrees were entered, the Atchison, Topeka, and Santa Fé Railroad Company, or the Pueblo and Arkansas Valley Railroad Company, have, by valid contract, acquired a controlling interest in the property, rights, and affairs of the Denver Company, that interest can be asserted by appropriate proceedings, and will not be affected by any thing we may determine upon the issues presented by these appeals.

The several acts of Congress upon which the Denver Company and the Cañon City Company rest their respective claims to priority of right in the Big or Grand Cañon are cited, and the history of the organization of both companies given in the statement of the case. But there are other facts of an important character to which attention will be called in the course of this opinion.

The first question, upon the merits, necessary to be considered is, as to the proper construction of the act of June 8, 1872. In its determination, however, we should not overlook what had previously transpired in the history of the company to which was granted, by that act, a right of way over the public domain. In January and February, 1871, very shortly after its articles of incorporation were filed in the proper office of the Territory, the Denver Company caused a survey to be made of the route through the Grand or Big Cañon of the Arkansas, for the purpose, as declared by the engineer who conducted it, of retaining control of the cañon for that company. That survey, extending through the entire length of

the cañon, is described by him as a "close preliminary;" that is, a line very near location, without an actual location of the curves. But the location of the curves, he testifies, could have been made in his office away from the cañon. With that exception, he pronounces it to have been a complete survey. The line thus surveyed was marked by stakes every hundred feet, numbered consecutively, and at points where it seemed necessary, a plus or stake between the hundred feet was added. Of the work then done, a map and profile were made and returned to the chief engineer of the company, and estimates sent to its general manager. Upon the occasion of that survey, or shortly thereafter, employés of the company, under the direction of its engineer, removed several hundred yards of material; graded several hundred feet at the upper outlet of the cañon, and put up a retaining wall ten to fifteen feet high, and about one hundred yards in length. In January, 1872, the survey was continued west of the cañon for a distance of four or five miles. While these surveys were being made, the company was employed in the construction of its road from Denver to Pueblo, and completed it to the latter place, within a few days after, or about the date of the passage of the act of June 8, 1872. It may also be stated, in this connection, that it completed its road from Pueblo to Labran, within eight miles of Cañon City, about the 1st of October, 1872, and to Cañon City in July, 1875. All this was consistent with a purpose, upon the part of the Denver Company, to avail itself ultimately, and within the time prescribed by law, of the granted right of way through the Grand Cañon.

Of what the company had done, prior to the passage of the act of 1872, towards effecting the objects of its incorporation, Congress, it is fairly to be presumed, was not uninformed. It was aware, we must also presume, of the routes designated in the charter of the company, for the main road and its several branches, all so connected as to constitute, when completed, an extended railway system for that entire region. That Congress was so informed is quite clearly indicated by the terms employed in the act of 1872. That act must, therefore, receive the same construction which would be adopted had it contained a full or detailed description of the routes of the main line and

branches. In this view, and having due regard to all the circumstances and condition of the company, when the act was passed, we do not doubt that the intention of Congress was to grant to the company a present beneficial easement in the particular way over which the designated routes lay, capable, however, of enjoyment only when the way granted was actually located, and, in good faith, appropriated for the purposes contemplated by the charter of the company, and the act of Congress. When such location and appropriation were made, the title, which was previously imperfect, acquired precision, and by relation took effect as of the date of the grant. The settled doctrines of this court would seem to justify that conclusion. *Railroad Company* v. *Smith*, 9 Wall. 95; *Schulenberg* v. *Harriman*, 21 id. 44; *Leavenworth, Lawrence, & Galveston Railroad Co.* v. *United States*, 92 U. S. 733; *Missouri, Kansas, & Texas Railway Co.* v. *Kansas Pacific Railway Co.*, 97 id. 491.

It is here suggested by counsel for the Denver Company that the surveys made in the Grand Cañon in 1871 and 1872 constituted, without further action on its part, a sufficient location and appropriation of at least that part of the designated route. To this proposition we cannot yield our assent. The right of way through that pass was not, in itself, and separate from the right of way along the whole route, of any special value, except the company surveyed its line and located its road east and west of that defile. The grant was an entirety as to the right of way over all the lands lying on the route designated in the charter of the company, and it would be unreasonable to say that, as to a particular part of that route, a mere preliminary survey was in itself equivalent to a fixed location of the road and an appropriation of the way granted, while as to another part of the general route a similar survey would not be an appropriation of the way granted, unless followed by actual occupation and use for railroad purposes. Any such construction of the statute must be held altogether inadmissible.

When was there, then, an appropriation by the Denver Company of the Grand Cañon within the principle we have stated? In 1877 and 1878 it became evident that that pass was of vital importance to any company desiring to reach the trade and business of the country beyond it, whether to

the west, northwest, or southwest. Discoveries then recently
made of mineral wealth in Western Colorado gave it immense
pecuniary value in railroad circles, since, as the evidence tends,
to establish the occupancy of the Royal Gorge of the Grand
Cañon by one line of railroad would practically exclude all
competing companies from using it for like purposes, except
upon such terms as the first occupant might dictate. From the
date of the survey made in 1872, down to April 19, 1878, the
record furnishes no evidence that the Denver Company actually
occupied that defile for any purpose whatever. On that day,
however, Congress having extended the time to ten years from
the date of the original act within which to complete its road
as far south as Santa Fé, that company did, by its agents, oc-
cupy the narrow portion of the cañon known as the Royal
Gorge, with the avowed intention of constructing its road upon
the line of the surveys made in 1871 and 1872. But during
the night of April 19, 1878, the board of directors of the Cañon
City Company were convened, and Robinson and Strong, the
chief engineer and manager, respectively, of the Atchison,
Topeka, and Santa Fé Railroad Company, were elected to the
same positions in the Cañon City Company. They made prep-
arations to take immediate possession of the cañon in behalf of
the last-named company. Evidence of their diligence and activ-
ity in that direction is found in the fact that on the morning of
the 20th, as early as four o'clock, a small squad of their em-
ployés, nine or ten in number, under the charge of an assistant
engineer, swam the Arkansas River, and in the name of their
company took possession of the cañon. Under the circum-
stances, it is not material that they failed to find a rival force
in the cañon at such an unseasonable hour. That squad was
followed the same day by a large and overpowering force of
workmen under the control of Robinson. These movements
were succeeded by a suit instituted the same day, in the State
court, in the name of the Cañon City Company against the
Denver Company, in which an injunction was obtained restrain-
ing the latter from occupying or attempting to occupy the cañon
for railroad purposes, or from interfering with the Cañon City
Company in the construction of its own road therein.

The last-named company now insists that it has the prior

right to occupy and use the cañon for its line of road. In support of this claim, it contends that the other company had lost whatever rights it acquired in the cañon through the imperfect survey of 1871 and 1872, by its long inaction after the construction of the road to Cañon City, and by its failure, within a reasonable period, to follow up those surveys by actual location and occupancy for railroad purposes. The conduct of the Denver Company, it is urged, evinced a settled purpose upon its part to abandon its grant of a right of way through that cañon. The answer to all this seems very obvious.

The surveys of 1871 and 1872, although defective in some particulars, and not equivalent to an actual location or appropriation of the way, were quite as complete and extended as the survey which the Cañon City Company caused to be made in 1877. The evidence shows, beyond all question, that when the latter survey was made there was seen in the cañon all or very many of the stakes which the engineer of the Denver Company had put there in 1871 and 1872. Those who made the survey in 1877 undoubtedly knew when, by whom, and for what purpose those stakes had been there placed. Nor had they sufficient reason to suppose that the Denver Company had finally abandoned its purpose of constructing a road through the cañon. We have already referred to the completion of the road from Denver to Pueblo, and from Pueblo to Cañon City, by July, 1875. In 1873, the Denver Company commenced the construction of one of its branches, — the Denver and Southern Railway. Commencing at Pueblo, it completed that road to Cucharas, fifty miles from Pueblo, by February, 1876; to Garland, sixty miles from there, by August, 1877; and to the valley of the Rio Grande, by July, 1878. After July, 1875, the company, it is true, suspended active work upon the line west of Cañon City. But the cause of such suspension, as its officers testify, was the widespread depression in business and financial circles, and the belief, shared by all interested in the prosperity of the company, that the extension of the line southward from Pueblo gave promise of quicker returns and more immediate results in every way. They state that it was the purpose of the company to resume work upon its line through the cañon as soon as the necessary means therefor could be obtained, and

that there was no intention at any time to abandon the route west of Cañon City. Their delay in the construction of the road west of Cañon City and through the Grand Cañon seems to have been in the interest of the stockholders they represented, and not inconsistent with an honest purpose, within the period fixed by law, to meet the objects for which Congress granted to it the right of way. Its surveys of 1871–72, followed by an occupancy of the cañon on the 19th of April, 1878, in advance of the Cañon City Company, for the purpose of constructing its road through that defile, was, in our judgment, a final appropriation of the way granted by Congress. The Denver Company then, if not before, came into the enjoyment of the present beneficial easement conferred by the act of June 8, 1872, and was entitled to have secured against all intruders whatever privileges or advantages belonged to that position.

But the important question remains as to the effect of the act of March 3, 1875, granting the right of way through the public lands of the United States to any railroad company duly organized under the laws of any State or Territory, except the District of Columbia, or by the Congress of the United States. The explicit language of that act leaves no doubt as to its object. It declares "that any railroad company whose right of way, or whose track or road-bed upon such right of way, passes through any cañon, pass, or defile, shall not prevent any other railroad company from the use and occupancy of said cañon, pass, or defile, for the purposes of its road, in common with the road first located, or the crossing of other railroads at grade." At the date of that act the road of the Denver Company, as we have seen, had not been located through the Grand Cañon of the Arkansas. But it had a subsisting grant of a right of way through that defile. According, therefore, to the act of March 3, 1875, the Cañon City Company, if it belonged to the class described in the first section of the act, might, for the purposes of its road, occupy and use that cañon in common with the Denver Company.

Upon this branch of the case, the first contention of the latter company is that the Cañon City Company was not "duly organized" under the laws of Colorado, and, therefore, by the terms of the act of March 3, 1875, was not entitled to

its benefits. But this objection is not well taken. The articles of incorporation filed by that company seem to be in substantial compliance with the statutes of Colorado. This objection need not be further considered.

But its right to claim the benefit of the act of March 3, 1877, is impeached upon the further ground that it was not organized in good faith, for the purpose of constructing a road for itself, but was the mere instrument of the Atchison, Topeka, and Santa Fé Company, by whom the real work of construction through the cañon was carried on. It is not to be doubted, under the evidence, that the Atchison, Topeka, and Santa Fé Railroad Company is the active power behind all the movements made in the name of the Cañon City Company for the occupation of the cañon, and that the former company, or some of its stockholders, were deeply interested in the success of the movement to drive the Denver Company from the Grand Cañon. But the Cañon City Company is none the less a railroad company, duly organized under the laws of Colorado. It is, therefore, embraced by the very letter of the act of March 3, 1875. We are unable to perceive upon what sound principle the courts can go behind its regular and lawful organization, and exclude it from the rights granted by that act, because in the prosecution of its work it derives assistance or accepts aid from another corporation, with which it may choose to share the benefits secured under the act of Congress.

Our next inquiry is as to the extent to which the rights of the Denver Company were affected or modified by the act of March 3, 1875. When that act was passed, its grant of the right of way by the act of June 8, 1872, had not been acted upon as to the Grand Cañon of the Arkansas. There had not been, on March 3, 1875, an actual location of its line through that defile, nor any occupancy thereof, in good faith, for the purpose of constructing its road. The five years originally given to that company, within which to complete its railway to a point on the Rio Grande as far south as Santa Fé, expired on the 8th of June, 1877. Before, however, the expiration of that period, the time was extended to ten years from the passage of the original act. Now, it is solely by reason of such extension that the Denver Company had the right, on the

19th of April, 1878, to take possession of the Grand Cañon, and prepare for the final location and construction of its road through that pass. When, therefore, it accepted the benefits of the act of March 3, 1877, it must be held to have assented to the provisions of the act of March 3, 1875, whereby it was declared, in the interest of the public, that any other railroad company duly organized under the laws of any State or Territory might use and occupy the cañon, for the purpose of its road, in common with the road first located. At the time of the passage of the act of March 3, 1875, Congress had become convinced of the importance to the country, and particularly to the Western States, of preserving cañons, passes, and defiles in the public domain for the equal and common use of all railroad companies organized under competent State or territorial authority, and to which might be granted by national authority the right of way. We may well presume that the extension of time accorded to the Denver Company by the act of March 3, 1877, would not have been given except subject to the conditions contained in the act of March 3, 1875. This conclusion renders it unnecessary that we should, in this case, consider whether Congress might legally have subjected the Denver Company, without its consent, to the provisions of the act of March 3, 1877, had that company actually located and constructed its road in or through the Grand Cañon within five years after the passage of the act of June 8, 1872.

It results from what we have said, that the court below erred in enjoining the Denver Company from proceeding with the construction of its road in the Grand Cañon. The decree, as entered, can only be sustained upon the assumption that the Cañon City Company had by prior occupancy acquired a right superior to any which the Denver and Rio Grande Railway Company had to use the cañon for the purpose of constructing its road. But that assumption, we have seen, is not sustained by the evidence, and is inconsistent with the rights given by the acts of Congress to the Denver Company. The Denver Company should have been allowed to proceed with the construction of its road unobstructed by the other company. Where the Grand Cañon is broad enough to enable both companies to proceed without interference with each other in

the construction of their respective roads, they should be allowed to do so. But in the narrow portions of the defile, where this course is impracticable, the court, by proper orders, should recognize the prior right of the Denver and Rio Grande Railway Company to construct its road. Further, if in any portion of the Grand Cañon it is impracticable or impossible to lay down more than one road-bed and track, the court, while recognizing the prior right of the Denver Company to construct and operate that track for its own business, should, by proper orders, and upon such terms as may be just and equitable, establish and secure · the right of the Cañon City Company, conferred by the act of March 3, 1875, to use the same road-bed and track, after completion, in common with the Denver Company.

The decrees in these causes are, therefore, reversed, with directions to set aside the order granting an injunction against the Denver and Rio Grande Railway Company, and also the order dissolving the injunction granted in its favor, and dismissing its bill. By proper orders, entered in each suit, the court below will recognize the prior right of that company to occupy and use the Grand Cañon for the purpose of constructing its road therein, and will enjoin the Cañon City and San Juan Railway Company, its officers, agents, servants, and employés, from interfering with or obstructing that company in such occupancy, use, and construction. It may be that, during the pendency of these causes in the court below, or since the rendition of the decrees appealed from, the Cañon City and San Juan Railway Company has, under the authority of the Circuit Court, constructed its road-bed and track in the Grand Cañon, or in some portion thereof. In that event, the cost thus incurred in those portions of the cañon which admit of only one road-bed and track for railroad purposes may be ascertained and provided for in such manner and upon such terms and conditions as the equities of the parties may require.

. The court will make such further orders as may be necessary to give effect to this opinion.

MR. CHIEF JUSTICE WAITE dissenting.

I dissent from the judgment in this case. In my opinion

the grant of the right of way to the Denver and Rio Grande Company, contained in the act of June 8, 1872, is no more than a license to enter upon and use such of the public lands of the United States as should be unoccupied and not appropriated to other purposes when the permanent location of its road with a view to actual construction should be made. Words which, in a grant of land to aid in building a railroad, imply a present grant need not necessarily have that effect in a grant of right of way only.

I think, also, the Cañon City and San Juan Company made the first permanent location with a view to actual construction through the pass in controversy. Consequently it secured the preference of routes, subject to a reasonable use of the route it occupied, if necessary, by the Denver Company in common with itself.