(January 22, 1910.)

# WILIAM BALDERSTON, Plaintiff, v. JAMES H. BRADY et al., Defendants.

[107 Pac. 493.]

STATE LANDS—POWER OF STATE LAND BOARD—DISCRETION OF BOARD—
TITLE TO SCHOOL LANDS—POWER OF BOARD TO RELINQUISH SCHOOL
LANDS.

1. The state board of land commissioners is vested under the constitution (secs. 7 and 8, art. 9) with the "direction, control and disposition of the public lands of the state under such regulations as may be prescribed by law."

2. Under the provisions of secs. 7 and 8 of art. 9 of the constitution, the direction, control and disposition of the public lands of the state must be in pursuance and under the direction of the constitution and statutes of the state, and not otherwise.

3. Where the proposed or contemplated action of the state land board involves the exercise of judgment and discretion vested in the board, the courts will not attempt to control or direct such discretion, or in any manner interfere with their action so long as it is exercised within the scope of their authority. Where, on the other hand, the proposed or contemplated action is without the authority of law, or has no legal sanction, the courts may interfere and interrupt their action and declare the law on the subject and point out to them the legal scope within which their judgment and discretion is to be exercised.

4. House joint resolution No. 10, adopted March 10, 1909 (1909 Sess. Laws, p. 451), has no force or effect as a law of the state, and can furnish no authority or justification for the state board of land commissioners either acting or refusing to act on any matter coming before them. They cannot rest or justify their action in any matter upon the authority or direction of such resolution or any action taken by the commission created by that resolution.

5. The state's title to sections 16 and 36 in every township in the state discussed and considered.

6. The state board of land commissioners has no power or authority conferred upon it, either by the constitution or statute of this state, to relinquish the state's right or title to sections 16 and 36, granted by the general government for common school purposes, and any action taken by the board or under its direction or authority attempting to relinquish or waive the state's right to such lands is void.

(Syllabus by the court.)

Original action by the plaintiff to procure a writ of prohibition, restraining and prohibiting the state board of land commissioners from relinquishing the state's right and title to certain indemnity school lands. The defendant board demurred to the petition. Demurrer overruled.

B. S. Crow, and Wyman & Wyman, for Plaintiff.

Plaintiff brings this application on the theory that the threatened action of the state land board is of *quasi*-judicial nature. The board can and does exercise *quasi*-judicial functions. (*Pierson v. Board,* 14 Ida. 159, 93 Pac. 775, and statutes there cited.) But nowhere in the constitution, in the statutes, or in the decision is there given it the power to adjudicate a controversy such as exists between the settlers and the state.

Under the constitution, the board is a trustee for the purpose of locating, managing and disposing of the grants of land made to the state by the national government. The right of a state or a state board to act as trustee with the duties and liabilities of such trusteeship is clearly recognized by the authorities. (1 Perry on Trusts, secs. 30, 41, 47.)

The state land board cannot make a gift of these lands after patent (or clear-list) is acquired by the state. Indeed, after the clear-list is issued to the lands, it cannot sell them

for less than $10 an acre.    (Art. 9, sec. 8, State Constitution; sec. 8, Admission Act.)

A trustee must show the utmost good faith in the management of his estate.    (28 Am. & Eng. Ency. of Law, 2d ed., 1045; *Savings Bank v. Davidson,* 97 Fed. 696, 38 C. C. A. 365; *Chesley v. Chesley,* 49 Mo. 540.)

Courts of equity will enjoin trustees from proceeding in disregard of the conditions necessary to the proper exercise of their authority, or from an improper use of such authority.    (10 Am. & Eng. Ency. of Law, 1st ed., 914, 915; 2 Perry on Trusts, sec. 816.)

What the state land board is really attempting in the present instance is to do indirectly what the constitution forbids it to do directly.    The defendant will not be thus allowed to circumvent the intention of the framers of the constitution.    (*McDonald v. Doust,* 11 Ida. 14, 81 Pac. 60, 69 L. R. A. 220.)

The officers of the state or other public officers can be enjoined in cases of fraud or where they are acting in bad faith.    (22 Cyc. 888; *Gravesend v. Curtiss,* 34 How. Pr. (N. Y.) 261.)

In the case of *Pyke v. Steunenberg,* 5 Ida. 614, 51 Pac. 614, this court held that a writ of mandate would lie against the state board of examiners, of which the governor is a member, to compel such board to act.    (See, also, *Pierson v. Board,* 14 Ida. 164, 93 Pac. 775.)

D. C. McDougall, Attorney General, J. H. Peterson, Assistant, and Edwin Snow, for Defendants.

The demurrer should be sustained because a writ of prohibition will not lie against the governor or an executive body of which the governor is a member.    (*Stein v. Morrison,* 9 Ida. 426, 75 Pac. 246, and cases cited; *Bragaw v. Gooding,* 14 Ida. 288, 94 Pac. 438; *Greir v. Taylor,* 4 McCord, 206, 17 Am. Dec. 731; *State v. State Land Board,* 23 Wash. 700, 63 Pac. 532; 10 Cent. Dig., "Constitutional Law," cols. 1438-1441; 4 Dec. Dig., "Constitutional Law," sec. 73; 8 Cyc. 857; 22 Cyc. 881.)

Even though the courts might interfere with purely ministerial acts of an officer belonging to a co-ordinate branch of the government, the courts cannot in any wise control the acts of an officer where such acts involve *discretion* in matters of administration. (*Pierson v. Board,* 14 Ida. 159, 93 Pac. 775; *Corpe v. Brooks,* 8 Or. 222; 26 Am. & Eng. Ency. of Law, 2d ed., 385; *Vantongeren v. Heffernan,* 5 Dak. 180, 38 N. W. 58.)

Title to the land in controversy in this case has not vested in the state. That being the case, the acts of the land board with respect to these lands, until they are clear-listed and title vests in the state, are part of the process of "selection." The "selection" of the granted lands is vested in the state land board by the state constitution, without qualification or without restraint. The legislature is equally powerless with the courts to control the discretion of the land board with reference to the selection of these lands.

Edwin McBee, and Gray & Knight, *Amici Curiae.*

The writ of prohibition will lie to restrain encroachment of jurisdiction, but not to control the exercise of a discretion legally invested. (*Hill v. Morgan,* 9 Ida. 718, 76 Pac. 323; *Pierson v. Board of Land Commrs.,* 14 Ida. 159, 93 Pac. 775.)

This court has no legal jurisdiction to control, either by prohibition, *mandamus* or injunction, the discretionary powers of the state land board. (*Gaines v. Thompson,* 7 Wall. 347, 19 L. ed. 62; *United States v. Seaman,* 17 How. 225, 15 L. ed. 226; *United States v. Guthrie,* 17 How. 284, 15 L. ed. 102; *United States v. Com. of Land Office,* 5 Wall. 563, 18 L. ed. 692; *Craig v. Leitensdorfer,* 123 U. S. 189, 8 Sup. Ct. 85, 31 L. ed. 114; *Litchfield v. Register and Receiver,* 9 Wall. 575, 19 L. ed. 681; *Marquez v. Frisbie,* 101 U. S. 473, 25 L. ed. 800; *Carrick v. Lamar,* 116 U. S. 423, 6 Sup. Ct. 424, 29 L. ed. 677.)

AILSHIE, J.—This is an original action commenced in this court by the plaintiff, as a citizen and taxpayer, praying for a writ of prohibition against the threatened action

of the state board of land commissioners, prohibiting and re-straining them from relinquishing the right and title of the state of Idaho to certain lands situated in Shoshone county and heretofore selected by the board under the land grants made by the general government to the state of Idaho. The board has filed a demurrer to the complaint, raising the suf-ficiency of the allegations of the complaint to entitle the plaintiff to the relief demanded. The facts pleaded and on the sufficiency of which we must pass are substantially as follows:

On July 6, 1901, the governor of the state applied to the commissioner of the general land office for the survey of a portion of the public domain in Shoshone county and de-scribed as township 44 north of ranges 2 and 3 east, Boise meridian. This application was made under the provisions of the act of Congress of August 18, 1894 (28 Stat. at Large, 372 and 394). Notice of the application was there-upon published in the "Idaho State Tribune" of Wallace, as required by the act of Congress. Official survey was there-after made by the government, and its approved plats were filed in the United States land office at Coeur d'Alene on July 5, 1905. It seems that the commissioner of the land office neglected to give notice to the local land office at Coeur d'Alene city of the application made by the state. Between the date of the application made by the governor for the survey and the filing of the approved plats in the land of-fice, a number of settlers went upon the lands and appear to have established their residence thereon. Under the act of Congress, the state was given a priority of sixty days from the filing of the approved plats in the land office in which to select and make filing on any of the lands included in the survey. Accordingly, the state board of land commissioners on July 9, 1905, offered filing lists at the Coeur d'Alene land office for a large portion of the survey, and the applications were refused on the ground that that office had no notice of the preference right of the state and that filings by settlers had previously been accepted. The filings of the state were accordingly rejected by the officers of the local land office.

The state of Idaho appealed from the action of the local office to the commissioner of the general land office. The commissioner held that the state had a prior and preference right over all settlers who entered upon the lands subsequent to July 6, 1901, the date on which the governor applied for the survey of these townships. The settlers thereupon appealed to the Secretary of the Interior, and on June 27, 1907, Secretary Garfield rendered a decision affirming the action of the commissioner of the general land office and sustaining the prior right of the state to file upon the lands included in its lists. (See *Thorpe et al. v. State,* 35 L. D. 640.) It appears that soon after the decision of the Secretary of the Interior the state board of land commissioners requested the secretary to withhold final order and judgment affirming the decision of the commissioner of the general land office and .directions to the local land office to receive the filings, and that accordingly the secretary has withheld the final order and instructions from the department in the premises. This, it appears, however, has been done solely on the request of the defendant board.

In the meanwhile, according to statements made in the briefs by counsel for the board, the matter crept into the political considerations in this state, and it seems that during the campaign preceding the general election of 1908 the two leading political parties made some promises or declarations that, if successful in the election, they would relinquish some of these lands to the settlers who had been unsuccessful in their contests before the department. In obedience, say the briefs, to those promises and representations the legislature, by house joint resolution No. 10, which passed the senate March 2, 1909 (1909 Sess. Laws, p. 451), adopted a resolution appointing a commission consisting of two members of the legislature and the state land commissioner, appointed by the governor, to investigate the claims of these settlers and to take testimony and report the same to the state board of land commissioners, together with their recommendations in the premises. It also provided that the state board of land commissioners should act upon the unani-

mous recommendations of the commission.   Subdivision 11 of sec. 8 of the resolution provides as follows:

"Provided, that no recommendation shall be made unless with the approval of all members of the commission, and it is further, provided, that the detailed report of the commission, as required in section III, be filed with the state board of land commissioners, within thirty days after the completion of the investigation; and that the state board of land commissioners shall, within thirty days after the filing in their offices of the report and recommendations of the said commission, relinquish or cause to be relinquished all the rights of the state of Idaho to the lands claimed by said claimants, or such portion thereof as may be recommended to the favorable action of the state board of land commissioners."

The commission, acting under authority of this resolution, proceeded to the county where the lands are situated, and took testimony, and thereafter made their findings and report, and filed the same with the state board of land commissioners, recommending that certain tracts of land claimed by various settlers be relinquished and that the state's filing thereon be canceled.

The complaint alleges that the board is about to and threatens to act in conformity with the recommendations of the commission and the provisions of the resolution, and relinquish all the right, title, interest and claim of the state in and to the lands described in the report and recommendations.   It is to prevent this threatened action on the part of the board that the present suit is filed.

In support of the demurrer the defendant contends that the board is vested by the constitution (sec. 7, art. 9) with unqualified power and authority over the lands granted by the United States to the state, and is vested with unlimited discretion in the matter of selection of such lands, and may likewise, in its discretion, relinquish any such lands.   Secs. 7 and 8 of art. 9 of the constitution provide as follows:

Sec. 7: "The governor, superintendent of public instruction, secretary of state and attorney general shall constitute

the state board of land commissioners, who shall have the direction, control and disposition of the public lands of the state, under such regulations as may be prescribed by law.''

Sec. 8: ''It shall be the duty of the state board of land commissioners to provide for the location, protection, sale or rental of all the lands heretofore, or which may hereafter be, granted to the state by the general government, under such regulations as may be prescribed by law, and in such manner as will secure the maximum possible amount therefor: Provided, that no school lands shall be sold for less than ten (10) dollars per acre. No law shall ever be passed by the legislature granting any privileges to persons who may have settled upon any such public lands, subsequent to the survey thereof by the general government, by which the amount to be derived by the sale, or other disposition of such lands, shall be diminished, directly or indirectly. The legislature shall, at the earliest practicable period, provide by law that the general grants of land made by Congress to the state shall be judiciously located and carefully preserved and held in trust, subject to disposal at public auction for the use and benefit of the respective objects for which said grants of land were made, and the legislature shall provide for the sale of said lands from time to time and for the sale of timber on all state lands and for the faithful application of the proceeds thereof in accordance with the terms of said grants: Provided, that not to exceed twenty-five sections of school lands shall be sold in any one year, and to be sold in subdivisions of not to exceed one hundred and sixty (160) acres to any one individual, company or corporation.''

Now, there can be no question or doubt but that the ''direction, control and disposition of the public lands of the state'' is vested in the state board of land commissioners. It is equally clear and certain that this power must be exercised ''under such regulations as may be prescribed by law.'' Both of the foregoing sections of the constitution contain the same provision as to this limitation of power. The legislature is prohibited, however, from passing any law that would authorize a sale of school lands for less than ten dollars per

acre or any sale or disposition other than "at public auc-
tion." In many of the matters coming before the board in
reference to state lands they must exercise their judgment
and discretion, and it is a well-settled principle of law that
in such cases the courts will not attempt to control or super-
vise the discretion vested in the officers of a co-ordinate
branch of the government. We held to the same effect in
*Pierson v. State Board of Land Commissioners,* 14 Ida. 163,
93 Pac. 775. The finding of the board on the *facts* of any
given matter of inquiry is final and conclusive (*White v.
Whitcomb,* 13 Ida. 490, 90 Pac. 1080; 214 U. S. 15, 29 Sup.
Ct. 599, 53 L. ed. 889); but an error made in applying the
law to the facts or an erroneous construction of the law by
the land department may be reviewed and corrected by the
courts. In *Pierson v. Board, supra,* this court said: "If they
[the board] act in a matter without jurisdiction, there is a
remedy; if they misapply the law to the fact found, or in
case of fraud there is a remedy. . . . . ."

It is obvious that if the contemplated action of the board
of land commissioners involves the exercise of a judgment or
discretion vested in them by law, then this court cannot,
and will not, attempt to control that discretion or in any man-
ner interfere with or direct the action of the board. If, on
the other hand, the action proposed is without authority of
law or has no legal sanction or authority, or is an attempt to
act, not upon the discretion and judgment of the board but
upon a substituted judgment or discretion, or upon the judg-
ment, discretion and direction of some other board or body,
then and in such cases this court may interrupt them and
declare the law on the subject, and point out to them the
legal scope within which their judgment and discretion must
be exercised.

It has been urged in this case, not by counsel for the state
but by associate counsel who are really representing the claim-
ants to this land, that under the authority of *Stein v. Morri-
son,* 9 Ida. 426, 75 Pac. 246, the writ of prohibition will not
lie against the governor or a board of which the governor is
a member. The case cited falls far short of going to the

length claimed for it by counsel. In that case the court, after stating the respective positions of counsel and the trend of the argument made on the subject, stated its legal conclusion as follows: "It seems to us that to keep within the principle of our constitution (sec. 1, art. 2), and form of government, which recognizes the independence and specific character of the 'three distinct departments' of government, that the judicial department could not attempt to prohibit either of the other departments from *acting* within the recognized scope of their respective branches of the government, but that, on the other hand, the legal effect of such action after it has been taken may be inquired into by the court." It will be observed that the test enunciated by the foregoing statement is that the action proposed to be taken must be "within the recognized scope of their respective branches of the government." It is doubtful if anyone would seriously contend that the process of the courts will not run against an individual or individuals, holding an executive office or offices or comprising an executive board, simply because they occupied such official position and were assuming to act as officials, although their action was beyond the scope of their authority and wholly unauthorized by law. We do not hold such a position tenable, and have never so held.

It is also urged that the writ of prohibition will not run against the chief executive, and that since the governor is a member of the state board of land commissioners, the writ will not lie against that board. This position is without merit. As stated in *Stein v. Morrison, supra,* it is held by many authorities that the writ of prohibition will not lie against the governor of the state to restrain him from performing an executive act. This case does not fall within the line of those authorities nor within the reason on which they rest. The state board of land commissioners is a constitutional body. It is composed of four members, each of whom has a vote on all matters coming before the board. This board is as distinct and separate from all other offices as is the office of governor or judge of this court. It is created by the same instrument which created the office of governor

and the judicial department of the state. The individuals who compose the board and discharge its duties happen to be state officers, and it so happens that the governor of the state by reason of being governor is chairman of the board. When acting and voting at a meeting of the state board of land commissioners and discharging the particular and special duties devolving upon the board, he is not acting as the chief executive, but, on the contrary, is acting as one of four members of a board in the discharge of certain ministerial and *quasi*-judicial duties imposed on such board by the constitution and statutes. The writ, if issued, would run against the board and not against the governor.

Passing now to a consideration of the action of the legislature, we find that the joint resolution of March 2, 1909, under which this commission was appointed and the report has been made, is not a law of the state. It is not enacted in the manner provided for the enactment of a law (sec. 15, art. 3), and it is not contended that it is a law. On the other hand, it directs "that the state board of land commissioners shall, within thirty days after the filing in their offices of the report and recommendations of the said commission, relinquish or cause to be relinquished all the rights of the state of Idaho to the lands claimed by said claimants, or such portion thereof as may be recommended to the favorable action of the state board of land commissioners." This is not advisory or recommendatory, but is made mandatory. This resolution furnishes no authority of law for the action or direction of the state board, and the board cannot act under it or rest any action or judgment or decision made by it upon the resolution. To do so would not be acting on the *judgment and discretion* of the board but upon a substituted judgment, namely, that of the commission appointed by the resolution. If this were a legislative enactment in the form of a law, it would still be a serious question if the legislative department of the state could either authorize or direct the land board to part with the state's title and right to school or other lands for less than the constitutional minimum price or without a sale "at public auction."

It is contended that the board might discover that some of the land included in the lists filed is worthless, and that they might determine it wise to omit such land from the further lists and take other land instead thereof. That contention may be conceded so far as this case is concerned, and still the admission will not answer the difficulty confronting us in this case. It is alleged by the complaint that the defendant board are threatening and proposing to act upon the report of the commission, and in conformity with the resolution passed by the legislature and the investigation and report thereon, and are about to relinquish and surrender up the right and title of the state to this land. That allegation necessarily admitted by the demurrer takes the question of the discretion and judgment of the board out of the case, and rests the action of the board entirely and solely upon this legislative resolution and the investigation and report had and made thereunder.

The constitution of this state was framed by the constitutional convention eleven months prior to the admission of the state into the Union, and it was ratified by the people some eight months before the admission. Notwithstanding this fact, the people at that early date incorporated into the fundamental law of the state secs. 7 and 8 of art. 9, heretofore quoted, and thereby forbade the legislature authorizing any sale of land for less than $10 per acre or ever "granting any privileges to persons who may have settled upon any such public lands, subsequent to the survey thereof by the general government, by which the amount to be derived by the sale, or other disposition of such lands, be diminished, directly or indirectly." It was provided that the legislature should enact laws whereby the general grants of lands made by Congress to the state should be "judiciously located and carefully preserved and held in trust" for the several purposes and objects for which they were granted. The admission bill followed the provisions of the constitution, and by secs. 8 and 11 thereof it is provided that none of the lands granted by Congress to the state should ever be sold for less than $10 per acre. It needs only to be called to mind to be

at once apparent that the legislature cannot authorize the
land board or anyone else to do any act with reference to
state lands that is forbidden by the constitution. Any gift
of school or other state lands or relinquishment of the state's
title is in violation of the fundamental laws of the state, and
would be void.

Another thing that should not be overlooked in this case
is that the board must act "under such regulations as may be
prescribed by law." The right of the state to this land has
been adjudicated and determined by the Interior Depart-
ment of the government after a contest before that depart-
ment covering a period of about nine years. The state has
been pursuing its legal rights, and the issue has been deter-
mined by the duly constituted tribunal in favor of the state.
No privity of interest existed between the state and these set-
tlers. The state was not acting in its sovereign or govern-
mental capacity, but purely in its proprietary and business
capacity in acquiring title to property. In such capacity it
could owe no duty to the citizen or settler except to keep
within its legal rights and refrain from trespassing upon or
interrupting any of the like rights of the settler. The Sec-
retary of the Interior, the final arbiter in such matters, has
found that the state was well within its rights and that the
settlers had no rights in the premises. Now, it is proposed
to turn the land board or the commission appointed under
this resolution into a kind of court of equity, and after a
nine years' lawsuit and the expenditure of thousands of dol-
lars to attorneys and agents for arguing and urging the
state's claim at Washington, to reverse the judgment of the
Interior Department and conclude that the state has for nine
years been waging an unconscionable demand for a part of
the public domain that rightfully belongs to settlers. The
land board is not a court of equity; it is an executive board
charged with duties that must be executed *in conformity with
law.*

Some such argument as is now made in support of the pro-
posed action of the state land board was evidently made by
the attorneys for the settlers before the Secretary of the In-

terior. The counsel for the state made reference to that fact in their brief, and said:

"There is all through the appellants' [the settlers'] brief the assumption of some wrong done the settlers by the state. It is asserted that the grants to the state were 'in derogation of the common rights of the settlers,' 'must be strictly construed,' and that its selections in this case were in some way irregular or unfair. The officers who are representing the state in this matter feel, on the other hand, that in seeking to satisfy the grants for common school purposes, they are in the highest sense endeavoring to acquire this land as a heritage of the whole people. These very settlers who are appellants here will share in the benefits of the state's· success." (35 L. D. 640.)

It was only after the subject had entered the domain of politics (as stated by the briefs), and political conventions had made promises and declarations in consideration for votes, that any different view appears to have been taken of this matter than that expressed in the state's brief before the Interior Department. The only thing in the way of carrying out this promise is that it would be a violation of the law. There is no statutory law to prevent political parties making all the promises they see fit to make, but whenever they undertake to carry out those promises by giving away the school lands, the heritage of the children of the state, the law steps in and forbids.

It has been urged on the oral argument in this case that at least a part of this land was selected as indemnity or lieu land instead of sections 16 and 36 in the Coeur d'Alene Indian reservation. That question does not directly arise on the consideration of this demurrer, but since it is incidentally involved in the consideration of another phase of the case and will arise in the final determination of the case, we will give it consideration here. As has been heretofore observed in this opinion, the people of the state had adopted the constitution prior to the passage of the admission act. The act of July 3, 1890, admitting Idaho into the Union, specifically "accepted, ratified and confirmed" the state constitution, and

the state came into the Union immediately upon the passage and approval of the admission bill. Nothing remained for the state to do to bring itself within the provisions of the act of admission. It was then a state.

Sections 4 and 5 of the admission bill provide as follows:

Sec. 4: "That sections numbered 16 and 36 in every township of said state, and where such sections or any parts thereof, have been sold or otherwise disposed of by or under the authority of any act of Congress, other lands equivalent thereto, in legal subdivisions of not less than one-quarter section, and as contiguous as may be to the section in lieu of which the same is taken, are hereby granted to said state for the support of common schools, such indemnity lands to be selected within the state in such manner as the legislature shall provide, with the approval of the Secretary of the Interior."

Sec. 5: "That all lands herein granted for educational purposes shall be disposed of only at public sale, the proceeds to constitute a permanent school fund, the interest of which only shall be expended in the support of said schools. But said lands may, under such regulations as the legislature shall prescribe, be leased for periods of not more than five years, and such lands shall not be subject to pre-emption, homestead entry, or any other entry under the land laws of the United States, whether surveyed or unsurveyed, but shall be reserved for school purposes only."

It will be observed that the language of this grant is *in praesenti*. The grant would therefore seem to be a *present grant*. The act says that sections "16 and 36 in every township of said state . . . . are hereby granted to said state for the support of common schools." It also provides for the selection by the state of "indemnity lands" to reimburse the state "where such sections or any parts thereof have been sold or otherwise disposed of by or under the authority of any act of Congress." This evidently had reference to the time of the passage of the act, and meant that lieu or "indemnity lands" might be selected for such lands *as had been sold or disposed of at the time of the admission of the state.*

This is áccentuated by the provisions of the latter part of
sec. 5, saying that no such lands, "whether surveyed or un-
surveyed," shall be "subject to pre-emption, homestead en-
try, or any other entry under the land laws of the United
States." This act, it will be observed, is different from most
of the previous land laws as well as land grants, in that it
specified and included "unsurveyed" lands and thereby with-
drew all the "unsurveyed" sections 16 and 36 from settle-
ment or "entry under the land laws."

Sec. 13 of the admission bill specifically provided against
the contingency which arose in the Nevada admission bill (13
Stats. at Large, 30), as construed in *Heydenfelt v. Daney G.
& S. M. Co.*, 93 U. S. 634, 23 L. ed. 995. That section provides
that all mineral lands shall be exempt from the grants made by
the admission bill, and authorizes the state to make selections
of lieu land for sections 16 and 36 wherever such sections
might be lost to the state by reason of being mineral lands.
The Nevada admission bill contained no such exemption or
reservation. The chief reason, however, given by the court
for the decision in the Nevada case does not exist or apply
here, for the reason that many of the sections numbered 16
and 36 in Idaho had been "sold or otherwise disposed of"
prior to the admission of the state. It may be further noted
that sec. 14 of the admission bill negatives the idea of the
necessity for a selection of section 16 and 36, and of the
Secretary of the Interior having any control or direction
whatever over such sections. His authority and direction is
confined by that section to "lands granted in quantity or as
indemnity" lands.

It seems to be intimated that the admission bill was in some
way amended and modified by act of August 18, 1894, and
other amendments to the land laws (28 Stat. 372, 394), but
we know of no power or authority whereby the Congress can
divest the state of its title to lands that have been previously
granted and to which title has vested.

It is not improper to note another significant fact in this
connection. On February 22, 1889, which was about a year
and a half prior to the admission of Idaho, Congress passed

an act (25 Stats. at Large, 679), authorizing the people of North Dakota, South Dakota, Montana, and Washington to form constitutions and state governments and providing that they might thereafter be admitted as states. That act, by sec. 10 thereof, provided that the new states should upon their admission into the Union receive sections 16 and 36, in every township, for common school purposes. That same section, however, contained a proviso that is nowhere to be found in the Idaho admission bill. That proviso specifically excepts and reserves from the operation of the act sections 16 and 36 "in permanent reservations for national purposes" and "any lands embraced in Indian, military, or any reservations of any character." It is significant that the Idaho admission bill passed subsequent to the passage of the foregoing act contained no such exception or reservation. There is nothing in the entire admission bill which negatives the idea of a *present grant*. The grantee was in existence at the time of the passage of the act, and the lands were in the state, some surveyed and others unsurveyed. The fact, however, that the land was not surveyed could make no difference where the numbers of the sections were specifically given. The title to unsurveyed lands may be as readily conveyed as that to surveyed lands. It is a maxim of law that that is certain which is capable of being made certain. (*Id certum est, quod certum reddi potest.*) All that remained to be done in order to identify these lands on the ground was to have the survey extended over them. The description in the grant was definite and certain. So far as we are aware it has been the uniform holding of the supreme court of the United States that such grants are grants *in praesenti*, and immediately vest title in the grantee. The principal if not the only exceptions to this rule are *Heydenfelt v. Daney G. & S. M. Co., supra, Hall v. Russell*, 101 U. S. 503, 25 L. ed. 829, and *Rice v. Minn. & N. W. R. Co.*, 66 U. S. 358, 17 L. ed. 147. The Heydenfelt case, so far as we can find, has never been referred to by the supreme court but once (*New York Indians v. United States*, 170 U. S. 18, 18 Sup. Ct. 531, 42 L. ed. 927), and it was there mentioned as one of the rare excep-

tions to the general rule in construing land grants. The cases to the contrary are too numerous to attempt to collate them all. (See *Schulenberg v. Harriman,* 21 Wall. 44, 22 L. ed. 551; *Leavenworth L. & G. R. Co. v. United States,* 92 U. S. 733, 23 L. ed. 634; *Mo. K. & T. R. R. Co. v. Kansas P. R. R. Co.,* 97 U. S. 491, 24 L. ed. 1095; *Den. & R. G. Co. v. Alling,* 99 U. S. 463, 25 L. ed. 438; *St. Paul & R. R. Co. v. Northern Pac. R.,* 139 U. S. 1, 11 Sup. Ct. 389, 35 L. ed. 77; *Deseret Salt Co. v. Tarpey,* 142 U. S. 241, 12 Sup. Ct. 158, 35 L. ed. 999; *New York Indians v. United States, supra.*)

A holding that the state, hampered as it always is in such matters, was intended to run a race with settlers, land scrip brokers, railroad companies, and timber and stone land-grabbers to secure the remnant and refuse of the public domain as lieu and indemnity lands for all its best and most valuable school land sections, 16 and 36, would render sections 4 and 5 of the admission bill only a delusion and an idle declaration. At the time of the admission of the state into the Union, less than one-fifth of the area of the state had been surveyed. There remained about forty-four million acres to survey. If title vested in the state to the school sections only that had been surveyed, the state was getting merely the barest *contingency* for the unsurveyed sections, notwithstanding the declaration in the act that "whether surveyed or unsurveyed" such lands should not be subject to any kind of entry.

This discussion, however, is collateral and incidental only to the main point with which we are here interested. Whether the government through any of its agencies has the power to reclaim the school sections granted by the admission bill is immaterial so far as the government is concerned, because Congress by the act of August 18, 1894 (28 Stats. at Large, 372), and other acts dealing with the public domain, has amply authorized the Interior Department to grant indemnity and lieu lands to the states for any and all lands lost or relinquished by the state. (Opinion of Atty. Gen. of Sept. 15, 1909; Decision Secretary Interior in *Heirs of Irwin v. Ewing and State of Idaho,* filed subsequent to Sept. 15, 1909, and not yet officially reported.) The real question then re-

curs: Has the state authorized the relinquishment of sections 16 and 36, and has the state land board the authority to relinquish the state's right to such lands? But one answer can be given to this query. The authority for such an act cannot be found in either the constitution or statute. It is, therefore, perfectly safe to say that no such power exists. We have hereinbefore said that the board must act under the law. It must find authority in the constitution and statute for its acts. No such authority as claimed exists, · and it is clear that the state land board has no power to relinquish or surrender the right or title of the state of Idaho to any of its school lands. If the state's title to any of these lands comprising sections 16 and 36 is questioned or denied by the department, then the duty of the state to secure an adjudication of the matter by the federal supreme court is plain and unmistakable.

It follows, therefore, that whatever may be said with reference to the state's vested rights in sections 16 and 36, it is plain that where such sections are found to be mineral lands the state's title fails by reason of such fact and the land board are authorized, and indeed it is their duty, to make indemnity selections from other lands to reimburse the state for the loss. If the state agent, in making the filing, should err in describing the lands lost, sold or disposed of for which the lieu land selection is being made, we do not apprehend such an error would defeat the state's right to make the selection and acquire the title to such lands and have them properly charged against such lands as it had actually lost, by reason of the mineral character of school sections or by reason of loss to the state of any of its public grants from any other legal cause.

The complaint states a cause of action and the demurrer will be overruled. It is well enough to suggest at this time that the action of the commission appointed by the joint resolution of the legislature has no place in the consideration and decision of the land board, and can furnish no protection or justification for any action by the board, and no evidence on that subject would be admissible or considered in this case.

Neither will evidence as to the condition of these lands or the *bona fides* of the settlers be considered. Their claim has been one against the United States, 'and they must wage that claim against the general government and not against the state. The state has acquired whatever right, title or claim it now has to the lands freed of any and all claims by the settlers.

Sullivan, C. J., and Stewart, J., concur.