(May 10, 1911.)

## G. B. ROGERS, Plaintiff, v. JAMES H. HAWLEY et al., Defendants.

[115 Pac. 687.]

SCHOOL LANDS—RELINQUISHMENT OF SCHOOL LANDS—POWERS OF LAND BOARD—EXCHANGE OF LANDS—CONSTITUTIONALITY OF SENATE BILLS 47 AND 133—LEGISLATIVE RATIFICATION OF ACTS OF LAND BOARD.

(Syllabus by the court.)

1. Senate Bill No. 47, approved February 8, 1911, entitled "An act prescribing certain powers and duties of the state board of land commissioners in relation to the location, protection, relinquishment, selection and exchange with the national government of certain lands granted to the state by the general government and filling the quantity of the grant, and adopting, ratifying and approving the action of the state board of land commissioners in relinquishing certain state lands and in selecting indemnity lands in lieu thereof," is not in violation of either section 7 or 8 of article 9 of the constitution, but is a valid and constitutional exercise of the authority conferred on the legislature to regulate and prescribe by law the manner and method by which the land board may exercise the constitutional powers conferred on such board, whereby it is given the "direction, control and disposition of the public lands of the state," and is commanded "to provide for the location, protection, sale or rental of all the lands heretofore or which may hereafter be granted to the state."

2. Senate Bill No. 47, approved February 8, 1911, which authorizes the state land board to relinquish to the general government unsurveyed school sections in exchange for surveyed, unreserved and unappropriated public lands within the limits of the state "equivalent thereto in area and value, in legal subdivisions and as contiguous as may be to the section in lieu of which the same is taken," is not, in contemplation of the constitution, a sale of school lands which would subject the transfer to the constitutional limitation that such lands must be sold for not less than $10 per acre, and that a sale or disposal of the land must be made at public auction, but is rather a simple exchange of lands whereby the state would be enabled to procure an equivalent area of land to which it could obtain immediate possession.

3. Section 2 of Senate Bill No. 133, approved March 4, 1911, and the similar section contained in Senate Bill No. 47, are not

in conflict with section 12, article 11, of the state constitution, which prohibits the legislature from passing any law "for the benefit of a railroad, or other corporation, or any individual or association of individuals retroactive in its operation."

4. The legislature, acting for and on behalf of the state as the representatives of the people, has the right to approve and ratify the action of the state land board in a transaction wherein the legislature would have had, in the first place, the power to authorize the doing of the thing which the land board has done and which it is proposed to ratify, adopt and confirm, even though the act when performed by the land board was without and in excess of the powers then conferred on such board.

5. The location, selection, direction, management, control, sale, rental or disposition of state lands involves the exercise of the business and proprietary powers of the state, and the legislature is given the authority to regulate the exercise of that power.

Original action praying for a writ prohibiting and restraining the state land board from the commission of certain alleged and threatened acts. Writ denied and proceeding dismissed.

E. G. Davis, for Plaintiff.

The grant of secs. 16 and 36 was *in praesenti,* and the title to these sections passed *eo instanti* from the government to the state without further action on the part of either the government or the state to perfect such title. No selection was necessary, because the act designated the land by recognizing subdivisions. As soon as surveyed, the title acquired precision and became attached to the land. (*Schulenberg v. Harriman,* 21 Wall. (U. S.) 44, 22 L. ed. 551.)

Even if we concede that the general government is not bound by the terms of the Idaho Admission Bill, and that it still exercises sufficient control over sections 16 and 36 to permit it to hold title to these lands and to grant others in lieu thereof, the state land board has not been given sufficient authority to warrant it in the steps it has taken, or is now taking, to relinquish the state lands and to accept other lands in lieu thereof. (Secs. 7 and 8 of art. 9, Idaho Constitution.)

It is not material, for the purposes of this discussion, to consider the question as to whether or not the title to sections 16 and 36 which passed to the state by the Idaho Admission Bill was a fee simple title or only a floating, equitable title which must await official survey to be made definite and certain and to vest absolutely in the state. It was the only title which the state had and it was to certain specific sections. If such sections had been previously disposed of or were determined to be mineral in character, no title whatever passed, and the state was authorized and empowered to select other lands in lieu thereof. But, in all other cases, some title at least would pass, and if we are to look for the authority of the land board or of the legislature to dispose of this title, we shall find such authority, if at all, in the state constitution. (*Balderston v. Brady,* 18 Ida. 240, 108 Pac. 742.)

Lands included within forest reserves are not "lost" to the state. These lands are withdrawn from all kinds of entry or appropriation, and it is evident that the inclusion of these lands in forest reserves neither deprives the state of present title or makes probable the ultimate loss of title, by the mere inclusions of some of these sections in forest reserves. No cause has arisen, therefore, which could possibly justify the state land board in presuming to relinquish whatever title the state has to any of these lands or to select and accept others in lieu thereof. Neither has it changed, nor could it ever change, the duties and powers of the legislature in reference thereto.

James E. Babb, *Amicus Curiae.*

Where the person of the grantee is ascertained and there is a present grant, the title vests in interest, even though the precise quantity and boundaries or description of the property granted is to be ascertained by means presently provided but at a later date. (24 Am. & Eng. Ency. Law, 2d ed., pp. 368, 389; sec. 3061, Rev. Codes; *Northern Pac. Ry. Co. v. Hussey,* 61 Fed. 231, 9 C. C. A. 463; *Northern Pac. Ry. Co. v. Meyers,* 172 U. S. 589, 19 Sup. Ct. 276, 43 L. ed. 564, and

cases cited; *Central Pac. Ry. Co. v. Nevada,* 162 U. S. 512, 16 Sup. Ct. 885, 40 L. ed. 1057.)

"With this identification of the section, the title of the state . . . . became complete, unless there had been a sale . . . . previous to the compact with the state. No subsequent sale or other disposition . . . . could defeat the appropriation." (*Beecher v. Wetherby,* 95 U. S. 517, 24 L. ed. 440.)

The emergency laws of the eleventh session, Senate Bills Nos. 47 and 133, assumed to ratify all relinquishments theretofore made by the state and all selections attempted to be made in lieu thereof, and are void as to any such relinquishments or selections theretofore made for the following reasons: (a) Because the acts, in so far as retrospective, violate sec. 12 of art. 11, constitution of Idaho. (b) Because in so far as the legislature attempts to construe the provisions of the constitution and statutes of Idaho and to declare the validity of acts done thereunder, either by way of ratification or confirmation of said acts or otherwise, it is exercising judicial and not a legislative province, and its action is therefore a nullity. (2 Lewis' Sutherland, Stat. Const., 2d ed., sec. 358.)

D. C. McDougall, Atty. Gen., and J. H. Peterson and O. M. Van Duyn, Assistants, and D. A. Dunning, for Defendants.

A careful analysis of sec. 4 of the Idaho Admission Bill, coupled with a review of the decisions of the supreme court of the United States and the decisions of the land department, justified the state land board of the state of Idaho, in the first instance, in the conclusion that a perfect legal title was not vested by said act, but that only a floating and equitable title passed to the state under the terms of the Admission Act; and this conclusion has been adopted by every land board since that time, and the policy of the state land board has become in a great measure fixed.

The exact question has never arisen in any case before the supreme court of the United States. The nearest case we have been able to find is that of *Nelson v. Northern Pac. Ry. Co.,* 188 U. S. 108, 23 Sup. Ct. 302, 47 L. ed. 406.

The case of *Heydenfelt v. Daney etc. Mining Co.*, 93 U. S. 634, 23 L. ed. 995, is another case that comes very near the case at bar.

The real intention of Congress was to grant to the state *in praesenti* a quantity of land equal in amount to the 16th and 36th sections, the grant to take effect when the status of the lands was fixed by survey and they were capable of identification. (*Minnesota v. Hitchcock,* 185 U. S. 370, 22 Sup. Ct. 650, 46 L. ed. 954; *Hibberd v. Slack,* 84 Fed. 571; *State of S. Dak. v. Riley,* 34 L. D. 657; *Oregon R. Co. v. U. S.,* 189 U. S. 103, 23 Sup. Ct. 615, 47 L. ed. 726.)

AILSHIE, Presiding J.—This is an original action instituted in this court, praying a writ asking, prohibiting and restraining the state board of land commissioners from the performance of certain threatened acts. By the plaintiff's first cause of action, he seeks to prohibit and restrain the board from relinquishing or attempting to relinquish the state's right in and to section 36, township 24 north, range 20 east, Boise Meridian, in Lemhi county, and selecting other lands in lieu thereof. By a second cause of action, he seeks to prohibit and restrain the board from making a sale of sec. 14, township 5 north, range 41 east, Boise Meridian, in Fremont county.

It is alleged that section 36, township 24 north, range 20 east, Boise Meridian, is unsurveyed, but that when the survey is extended over the same, it will be section 36, according to the government survey, and will therefore fall within the grant made to the state under the Idaho Admission Bill, whereby the United States granted to the state of Idaho every section 16 and 36 within the state for common school purposes. It is alleged that the state board of land commissioners threaten and are proceeding to assign and relinquish this section as a base for and in lieu of the selection of a like quantity of surveyed land, and this proceeding questions and disputes the power and authority of the board to make a relinquishment of an unsurveyed school section and take in lieu thereof surveyed lands.

It is also alleged by the second cause of action that the state board of land commissioners in the year 1905 made a relinquishment and assignment of an unsurveyed school section, and took in lieu thereof section 14, township 4 north, range 41 east, Boise Meridian, in Fremont county, and which latter section the land board now proposes to sell in the manner provided by law for the sale of school lands.

The only question that requires our consideration in this case is the power and authority of the state land board to assign as a base for lieu land selections sections 16 and 36 in a forest reserve, or in any other part of the unsurveyed public domain within the state. In *Balderston v. Brady*, 17 Ida. 567, 107 Pac. 493, and 18 Ida. 238, 108 Pac. 272, this court considered the power of the board to make a relinquishment of lieu land selections in favor of settlers, and held that the board had no such power or authority. That decision was based on the provisions of sections 7 and 8 of art. 9 of the constitution, which vests in the state land board the "direction, control and disposition of public lands of the state, under such regulations as may be prescribed by law," subject, however, to the limitations that no school land should be sold for less than $10 per acre, and that the lands received from the land grants should be "subject to disposal at public auction," etc. The case at bar raises the question alone of the power and authority of the land board to exchange the right, title, or interest of the state in and to unsurveyed school sections for a like area of surveyed and segregated land.

Since the decision in the Balderston-Brady case and at the last session of the legislature, the legislature passed two acts bearing on this subject. The first is Senate Bill No. 47, approved February 8, 1911, and entitled, "An act prescribing certain powers and duties of the state board of land commissioners in relation to the location, protection, relinquishment, selection and exchange with the national government of certain lands granted to the state by the general government, and filling the quantity of the grant, and adopting, ratifying and approving the action of the state

board of land commissioners in relinquishing certain state lands and selecting indemnity lands in lieu thereof." In dealing with the provisions of this act, we shall hereafter refer to it as Senate Bill No. 47.

The other act is Senate Bill No. 133, approved March 4, 1911, and entitled, "An act accepting the provisions of the sections 2275 and 2276 of the Revised Statutes of the United States as amended by an act of Congress, approved February 28, 1891 (20 St. L. 796), and the rights and privileges granted thereby and ratifying and approving the actions of the state board of land commissioners under said act of Congress." By sec. 1 of this latter act, the state accepts the provisions of secs. 2275 and 2276 of the Revised Statutes of the United States, as amended by act of Congress February 28, 1891. By sec. 2 of the same act, it is provided "that all relinquishments of state lands in place heretofore lawfully made by the state board of land commissioners as a basis for the selection of indemnity lands in lieu thereof, and all selections of indemnity lands in lieu of lands so relinquished by the state board of land commissioners, are hereby ratified, approved, adopted and confirmed by the state of Idaho as of the date of such relinquishments and selections."

Senate Bill No. 47 consists of six sections and an emergency section. It gives directions to the land board with reference to the selection of certain state lands and in making lieu land selections, and prescribes the powers and duties of the board in reference thereto. In so far as that act bears upon the powers of the board in this case, it is sufficient to say that it authorizes the state land board, whenever it ascertains that any section 16 or 36 has been settled upon by a *bona fide* settler prior to the survey thereof, to relinquish the same back to the government in exchange for "other lands equivalent in area and value, in legal subdivisions and as contiguous as may be to the section in lieu of which the same is taken"; and another section of the same act makes like provisions with reference to sections 16 and 36 "which may be embraced within any forest reserve or other reservation established under or by authority of any act of Con-

gress." The same act approves, ratifies and accepts on behalf of the state all acts done by the land board in assigning sections 16 and 36 as a base for the selection of indemnity lands in lieu thereof, and likewise ratifies, confirms and accepts on behalf of the state the action of the board in entering and filing upon any lands in lieu of such unsurveyed sections 16 and 36 and of sections which had been settled upon prior to the survey thereof by the general government.

Counsel on both sides of this case have directed their chief argument to the question touching the character of title the state acquired to sections 16 and 36 under the provisions of the Idaho Admission Bill (secs. 4 and 5.) Counsel for plaintiff contend that the state acquired a present and immediate and fee simple title to every section 16 and 36 within the state, which title vested on the passage and approval of the Admission Bill. The attorney general, on the other hand, contends that under the Admission Bill the state acquired only "a floating equitable title to all sections 16 and 36 within the state, which were nonmineral and undisposed of" at that time. As we view the question in the light of the recent acts of the legislature (Senate Bills Nos. 47 and 133, *supra*), it is not necessary or important that we consider the character or nature of the title the state has to unsurveyed sections 16 and 36, or any such sections as may have been settled upon prior to the survey thereof. In the first place, it is admitted on both sides that the state took some kind of a title or equity under secs. 4 and 5 of the Admission Bill to every section 16 and 36 within the state. Whether it be a title, absolute and indefeasible, or a mere inchoate right or "floating equity," will make no difference with the conclusion we reach in this case, for the reason that the case does not involve a mere naked relinquishment of the state's right and interest, but it rather involves an exchange of unsurveyed, unidentified school sections for "lands equivalent in area and value" to the sections in lieu of which the surveyed lands are taken. The board proposes to avail itself of the authority conferred by Senate Bill No. 47 and ex-

change the state's right in and claim to a certain unsur-
veyed and unidentified section 16, for a section that has been
surveyed and of which the state can get immediate possession.
There is no dispute but that the act in question confers the
authority the board proposes to exercise, and if it is not in
conflict with the state constitution, there can be no legal
objection to the action the board proposes to take. If Senate
Bill No. 47 is not valid, it must be because it is in conflict
with sections 7 and 8 of article 9 of the constitution. Those
sections read as follows:

"Sec. 7. The governor, superintendent of public instruc-
tion, secretary of state and attorney general shall constitute
the state board of land commissioners, who shall have the
direction, control and disposition of the public lands of the
state, under such regulations as may be prescribed by law."

"Sec. 8. It shall be the duty of the state board of land
commissioners to provide for the location, protection, sale or
rental of all the lands heretofore, or which may hereafter
be, granted to the state by the general government, under
such regulations as may be prescribed by law, and in such
manner as will secure the maximum possible amount there-
for: Provided, that no school lands shall be sold for less than
ten (10) dollars per acre. No law shall ever be passed by
the legislature granting any privileges to persons who may
have settled upon any such public lands, subsequent to the
survey thereof by the general government, by which the
amount to be derived by the sale, or other disposition of
such lands, shall be diminished, directly or indirectly. The
legislature shall, at the earliest practicable period, provide by
law that the general grants of land made by Congress to
the state shall be judiciously located and carefully preserved
and held in trust, subject to disposal at public auction for
the use and benefit of the respective objects for which said
grants of lands were made, and the legislature shall provide
for the sale of said lands from time to time and for the
sale of timber on all state lands and for the faithful appli-
cation of the proceeds thereof in accordance with the terms
of said grants: Provided, That not to exceed twenty-five

sections of school lands shall be sold in any one year, and to be sold in subdivisions of not to exceed one hundred and sixty (160) acres to any one individual, company or corporation.''

It will be noted that sec. 7 provides that the board of land commissioners shall have the ''direction, control and disposition of the public lands of the state, under such regulations as may be prescribed by law,'' while section 8 commands the board ''to provide for the location, protection, sale or rental'' of all state lands, ''under such regulations as may be prescribed by law.'' Now, it must be at once apparent that if Senate Bill No. 47 is a ''regulation'' of the powers and duties of the board, it is valid and constitutional, but if it goes beyond the scope of regulating the action of the board in the discharge of its constitutional duties, it is void. This statute certainly does not authorize or direct a sale of unsurveyed sections 16 and 36, and is not therefore obnoxious to the constitution on the ground that it authorizes a sale of school lands for less than $10 per acre, or that it authorizes a ''disposal'' of state lands in a manner other than ''at public auction.'' It does not authorize the unqualified surrender or giving away state lands, for the reason that it requires the board to secure title to ''lands equivalent in area and value in legal subdivisions,'' etc., as a condition precedent to a complete surrender of the state's title and interest in and to the unsurveyed section so released. This statute does not authorize the relinquishment of a school section without the state receiving an equivalent therefor in the same kind of property, namely, lands equal in area and value to those released. After the transaction is complete, the state will have a fee simple title to surveyed lands equivalent in area and value to the unsurveyed lands exchanged therefor. The state will still have the same amount of land that it had in the first place, and it will be surveyed and identified.

If this statute is followed and obeyed, and there is no reason to suppose it will not be, there can be no sacrifice or diminution of the state's property or interests, and the state

will at once have lands that it can lease to settlers and from which it can realize an income. Under the rule adopted by the supreme court of the United States in *United States v. Mont. Lumber & Mfg. Co.*, 196 U. S. 573, 25 Sup. Ct. 367, 49 L. ed. 604, and followed by this court and other courts (*Azcuenaga Bros. Livestock & Land Co. v. Corta, ante,* p. 537, 115 Pac. 18; *Clemmons v. Gillett,* 33 Mont. 321, 114 Am. St. 814, 83 Pac. 879, and *United States v. Birdseye,* 137 Fed. 516, 70 C. C. A. 100), there is no method whereby the state can identify an unsurveyed section of the public domain, and no evidence would be admissible to identify a school section until after the government survey has been made. In the absence of any means of locating the section on the ground and identifying it, the state cannot lease the land to anyone, and can consequently realize no profit or income from any unsurveyed sections. The constitution prohibits the sale of more than twenty-five sections of this land in any one year, and so it will be a great many years before the state can sell any considerable portion thereof—in fact, it will take one hundred and seventy years for the state to dispose of all its school lands under the constitutional limitation as to the amount that can be sold annually. About 1,129,000 acres of this land is included within forest reserves, and it is wholly problematic as to when the government will cause these reserves to be surveyed so that the state can enter into the actual possession and enjoyment of any of this large body of land.

We are of the opinion that Senate Bill No. 47 is the result of a constitutional exercise of the legislative power to regulate the procedure of the state land board in its dealing with state lands, and in prescribing the manner and method in which it shall acquire and perfect title to state lands and enter into actual possession and enjoyment of such property for the use and benefit of the state. This is a very different question from what it would be if the relinquishment were without consideration and amounted to an unqualified "disposal" or alienation of the lands relinquished or released,

and in this respect the present case differs essentially and vitally from the case of *Balderston v. Brady.*

In one of the causes of action pleaded, it is alleged that the relinquishment was made long prior to the passage of either Senate Bill No. 47 or 133, and was therefore made without color of authority, and that the state acquired no valid title to the lands selected in lieu of such relinquishments. Senate Bill No. 133 specifically provides "that all relinquishments of state lands in place heretofore lawfully made by the state board of land commissioners as a basis for the selection of indemnity lands in lieu thereof, and all selections of indemnity lands in lieu of lands so relinquished by the state board of land commissioners are hereby ratified, approved, adopted, and confirmed by the state of Idaho as of the date of such relinquishments and selections." Senate Bill No. 47 also contains a section (No. 5) substantially to the same effect as the foregoing.

It is urged with a great deal of earnestness that the foregoing provision of Senate Bill No. 133 is in violation of sec. 12, art. 11, of the state constitution, for the reason that it is retroactive in its operation. Sec. 12, art. 11, of the constitution is as follows:

"The legislature shall pass no law for the benefit of a railroad, or other corporation, or any individual or association of individuals retroactive in its operation, or which imposes on the people of any county or municipal subdivision of the state, a new liability in respect to transactions or considerations already past."

It will be noted that the foregoing provision of the constitution prohibits retroactive legislation which will be "for the benefit of a railroad, or other corporation, or any individual or association of individuals." Now, in so far as we gather from the provisions of Senate Bill No. 133, it would seem to have been enacted not for the benefit of any railroad or any other corporation, or any individual or association of individuals, but it rather seems to have been enacted for the benefit and protection of the state of Idaho, and is the act of the state through its legislative department,

approving, adopting and confirming the action of the board
in securing to the state title to certain lands, and to that end
it ratifies and approves the action of the board in relinquish-
ing to the general government certain lands in exchange for
the lieu lands thus acquired. This act cannot reasonably
be said to fall within the constitutional inhibition against
retroactive legislation. (*People v. Brooks,* 16 Cal. 11;
*State v. Torinus,* 24 Minn. 332.) Section 2 of the act, as
above set out, is not dealing with the administrative or govern-
mental powers of the state, but is rather directed solely at the
proprietary interests of the state. It is in furtherance purely
of the state's proprietary interests and is an exercise of that
power.

In *Balderston v. Brady,* in speaking of the exercise of the
powers of the land board for and on behalf of the state in
acquiring state lands, we said: ''The state was not acting
in its sovereign or governmental capacity, but purely in its
proprietary and business capacity in acquiring title to prop-
erty.'' Now, if an individual should appoint an agent and
send him out to acquire, manage, control and dispose of his
real property, and that agent exceeded his authority, it
would be perfectly competent for the principal to subse-
quently ratify and approve the action of his agent and adopt
the same, though it had not been done with full power and
authority in the first place.

Now, it may be conceded for the purposes of this case that
the action of the state land board in making relinquishments
of school sections prior to the passage of Senate Bill No. 47
was beyond and in excess of its power and authority, but
we are entirely clear that the legislature, acting for and on
behalf of the state as the representatives of the people, had
the right to approve and ratify the action of the state land
board in a transaction wherein the legislature would have
had, in the first place, the power to authorize the doing of
the thing which the land board have done and which it is
proposed to ratify, adopt and confirm. There was never any
question as to the right of the land board to take title to
any land which might be donated, given or granted to the

state, and the only serious question which could have arisen was that of the power of the board to make relinquishments of school sections.

In *Balderston v. Brady,* it was said that, "The state land board has undoubted power, under the constitution and statute (Const., sec. 8, art. 9, and sec. 1564, Rev. Codes), to acquire title to any and all lands which the general government may at any time give or grant to the state, and this is true whether the grant be general or special or in lieu of lands 'lost' or 'otherwise disposed of.' And so the power and authority of the board, acting as the agent of the state, to acquire and take title to grants or gifts of land for the use of any of the institutions or instrumentalities of the state is beyond question or doubt."

As the law now stands, it is no longer a question of legal authority on the part of the board to make these relinquishments in exchange for surveyed lands equivalent in area and value to those relinquished in exchange therefor. It is now purely a matter of policy and business expediency on the part of the land board as to whether or no it will make any relinquishments or exchange any of these unsurveyed school sections for other lands. With these questions of policy and proprietary interest the courts have nothing to do. The members of the land board are elected directly by the people and are accountable to them for their action in such matters, and the court cannot control or review the action of the board taken within the scope of its authority. (*Pike v. State Board of Land Commissioners, ante,* p. 268, 113 Pac. 447.)

From what has been said, we conclude that Senate Bills Nos. 47 and 133 are valid and constitutional, and that the board is acting within the scope of its powers and authority, and that the writ prayed for should not issue. Writ denied and the action is dismissed. No costs awarded.

Sullivan, J., concurs.