**GENEVA ROCK PRODUCTS, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**No. 08–920L.**

United States Court of Federal Claims.

Nov. 16, 2012.

J. Robert Sears, Baker Sterchi Cowden & Rice, LLC, St. Louis, Missouri, for plaintiff. With him on the briefs were Brent W. Baldwin, Steven M. Wald, Thomas S. Stewart, Elizabeth G. McCulley, and Anne E. Baggott, Baker Sterchi Cowden & Rice, LLC, St. Louis, Missouri, and Kansas City, Missouri.

E. Barrett Atwood, Trial Attorney, Natural Resources Section, Environmental and Natural Resources Division, United States Department of Justice, San Francisco, California, for defendant. With him on the briefs was Ignacia S. Moreno, Assistant Attorney General, Environmental and Natural Resources Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

This takings case concerns the transformation of a portion of a line of railroad called the Provo Industrial Lead and its attendant right-of-way into a recreational trail under Section 208 of the National Trails System Act Amendments of 1983, Pub.L. No. 98–11, § 208, 97 Stat. 42, 48 (codified at 16 U.S.C. § 1247(d)) ("Trails Act"). Prior to this transformation, each plot of land in question was burdened by an easement for railroad purposes, granted under the 1875 General Railroad Right–of–Way Act, 43 U.S.C. §§ 934–939 ("1875 Act") (repealed in part, Pub.L. 94–579, tit. VII, § 706(a), 90 Stat. 2793 (1976)). Plaintiffs comprise a class of twenty-six named and opt-in owners of property adjacent to the right-of-way.[1] They allege that the easements for limited railroad purposes were exceeded and thus destroyed, making the defendant liable for taking plaintiffs' property under the Fifth Amendment[2] by authorizing use of the property as a trail. See, e.g., Preseault v. Interstate Commerce Comm'n, 494 U.S. 1, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990). ("Preseault I") (holding that the Tucker Act, 28 U.S.C. § 1491(a), provided a remedy for an alleged taking of a property interest in land previously used as a railroad right-of-way that had been transferred to a public entity for use as a public trail). Before the court are the plaintiffs' motion for partial summary judgment and defendant's corresponding cross-motion, both of which address issues of liability and damages. Plaintiffs have also requested that the court reopen the class to give notice to, and potentially to admit, a discrete group of affected property owners who were not previously known and thus were not given notice of the pendency of the class action.

The court concludes that the government is liable to the plaintiffs for the taking of their property after exceeding the scope of the former easement. Further, the court holds that the proper method of calculating damages is the difference between the value of each parcel unencumbered by trail usage and its value so encumbered. Additionally, for good cause shown, the class shall be reopened for the limited purpose of providing notice to, and potentially admitting, the limited number of newly discovered potential members of the class.

## BACKGROUND

The setting for this takings dispute is a 3.23–mile strip of land previously used as a railroad right-of-way in Utah, spanning milepost 772.00 near Cutler, to milepost 775.23 near Mount. Am. Compl. ¶ 3. From 1875 until the early 2000s, this 200–foot–wide corridor was burdened by an easement for railroad purposes granted to Utah Southern Railroad Company pursuant to the 1875 Act. Stipulations, ECF No. 45 ("Stips."), ¶ 3. By the early 2000s, the railroad-purposes easement was held by Utah Southern Railroad Company's successor-in-interest, Union Pacific Railroad Company ("Union Pacific"). Stips. ¶¶ 3–4. Each plaintiff allegedly owns or owned a parcel or parcels of land adjacent to the pertinent segment of the corridor, plus a fee interest under the corridor that has

---

1. Twenty-six separate plaintiffs are named in the amended complaint, see Am. Compl. ¶¶ 6–20, although the parties otherwise refer to twenty plaintiffs, see, e.g., Mem. in Support of Pl.'s Mot. for Partial Summ. Judgment on Liability ("Pl.'s Mem.") at 1.

2. The Fifth Amendment specifies that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V.

been burdened by the railroad easement since its inception. Stips. ¶ 11. The parcels were originally granted to the plaintiffs' predecessors-in-interest through federal land patents. *Id.*

By 2000, and perhaps earlier, Union Pacific had ceased moving local traffic over the rail corridor. *See* Pls.' Proposed Findings of Fact ("Pls.' PFF"), Ex. A (Notice of Exemption (Nov. 12, 2002)), at 1. On January 28, 2002, the Utah Transit Authority ("UTA") filed a notice of exemption with the Surface Transportation Board ("STB"), proposing to acquire rights-of-way and physical assets from Union Pacific, reserving to Union Pacific an easement on the property to conduct freight rail operations. *Id.,* Ex. E. The STB dismissed the resulting proceeding on May 17, 2002, noting that

> the asset acquisition involved ... is not subject to Board jurisdiction and its consummation would not make UTA a common carrier because it will not conduct freight operations or hold itself out to the public as willing or able to do so, citing *Maine, DOT–Acq. Exemption, ME. Central R. Co.,* 8 I.C.C.2d 835 (1991) (*State of Maine* ). UTA states that U[union Pacific] will continue to be the only common carrier on the [l]ines performing freight operations after consummation of the transaction.

Pls.' PFF, Ex. F, at 3. After the STB's dismissal, Union Pacific and UTA consummated the proposed transaction. *See* Def.'s Response to Pls.' PFF and Def.'s Proposed Findings of Uncontroverted Facts ("Def.'s PFF") ¶¶ 15, 16.

Subsequently, on November 12, 2002, Union Pacific filed a notice of exemption with the STB to allow Union Pacific to abandon its remaining interest in the line. Pls.' PFF,

Ex. A (Notice of Exemption (Nov. 12, 2002)). One month later, on December 12, 2002, UTA requested a Notice of Interim Trail Use ("NITU") from the STB and stated its willingness to assume financial responsibility for trail use. *Id.,* Ex. B (Letter Requesting Issuance of NITU (Dec. 12, 2002)), at 1–2. Acting on that request, the STB issued a NITU on December 30, 2002, which was served the next day, December 31, 2002. *Id.,* Ex. C (NITU).

On March 13, 2003, Union Pacific notified the STB that it had reached an agreement with UTA for public recreational trail use along the line. Am. Compl. ¶ 10. This agreement also stipulated that the railroad line would be "rail-banked" for potential railroad use in the future. Pls.' PFF, Ex. B, (Letter Requesting Issuance of NITU), at 2.[3] That agreement has been effectuated; the Provo Industrial Lead line at issue has been converted to a recreational trail, and continues to be used as such at the present time. *See* Pls.' PFF, Ex. G (Affidavit of J. Robert Sears (June 14, 2012), and accompanying photograph).

On December 30, 2008, Geneva Rock filed suit in this court, alleging an uncompensated taking of its property contravening the Fifth Amendment. In this complaint, Geneva Rock argued that cessation of railroad activities across the burdened property effected an abandonment under Utah law of the railroad-purposes easement, leading to a taking when UTA continued to use the newly unburdened property as a trail. Compl. ¶¶ 8–13. In addition to the takings claim, Geneva Rock also requested certification of a class consisting of adversely affected residuary landowners. Compl. ¶¶ 14–16. This court granted the motion to certify the class action on

---

**3.** Rail-banking under the Trails Act preserves railroad-purpose easements which otherwise would terminate by operation of law, thus retaining the easements for potential later reactivation of railroad use. In pertinent part, the Trails Act provides:

> Consistent with the purposes of [the Railroad Revitalization and Regulatory Reform Act of 1976, 45 U.S.C. §§ 801–836] and in furtherance of the national policy to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use, *in the case of interim use of any established railroad rights-of-way* pursuant to donation, transfer, lease, sale, or otherwise *in a manner consistent with this chapter, if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes.*

16 U.S.C. § 1247(d) (emphasis added).

September 15, 2011, *see Geneva Rock Prods., Inc. v. United States,* 100 Fed.Cl. 778 (2011), and on October 11, 2011, the court approved an opt-in plan for providing class notice, *see* Order of Oct. 11, 2011, ECF No. 35. Potential plaintiffs were given until January 13, 2012 to join as members, and on January 27, 2012, plaintiffs filed an amended complaint listing all persons and entities who opted into the class. On February 3, 2012, plaintiffs produced a Claims Book to the government, *see* Am. Answer ¶¶ 6–20, identifying fifteen distinct claims, each associated with a named claimant (or claimants) and one or more parcels of land, *see* Def.'s Objections to Plaintiffs' Claims Book ("Def.'s Objections"), ECF No. 46, Ex. 1 ("Claims Book").

On June 15, 2012, plaintiffs filed their motion for partial summary judgment on the issues of liability and proper methodology to determine the amount of just compensation. On July 23, 2012, the government responded with a cross-motion for partial summary judgment on those same issues. During the course of briefing, the government raised objections to certain of the claims enumerated in the Claims Book, supporting the objections with additional information regarding ownership at the time of the alleged taking. *See* Def.'s Cross–Motion for Summ. Judgment and Mem. in Supp. and in Opp'n to Pls.' Mot. for Partial Summ. Judgment ("Def.'s Cross–Mot.") at 12. These challenges to individual claimants' ownership engendered a further investigation that unearthed a new set of potential plaintiffs who had not previously been identified as holding pertinent property interests and thus had not received notice of the pendency of the class action. *See* Pls.' Reply Mem. in Support of their Mot. for Partial Summ. Judgment ("Pls.' Reply") at 14–15; Def.'s Reply in Support of its Cross–Mot. for Summ. Judgment ("Def.'s Reply") at 8–9. These cross-motions have now been thoroughly briefed and were argued at a hearing held on October 2, 2012. At this hearing, plaintiffs moved to re-open the class of plaintiffs to give notice to, and potentially to admit as class plaintiffs, the discrete group of newly discovered affected owners, reiterating the request first made by way of the briefing on the motions for summary judgment. Hr'g Tr. at 21:4–9 (Oct. 2, 2012).[4]

## STANDARD FOR DECISION

A grant of summary judgment is warranted when the pleadings, affidavits, and evidentiary materials filed in a case reveal that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a) of the Rules of the Court of Federal Claims ("RCFC"). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine dispute is one that "may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505.

The party moving for summary judgment bears the burden of demonstrating the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Consequently, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). To establish "that a fact cannot be or is genuinely disputed," a party must "cite[ ] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials." RCFC 56(c)(1)(A). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial[,]' " and summary judgment is appropriate. *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 288, 88 S.Ct.

---

**4.** All subsequent references to the transcript of the hearing held on October 2, 2012 will omit the date.

1575, 20 L.Ed.2d 569 (1968)). Because cross-motions for summary judgment are pending before the court, the court must evaluate each motion on its own merits, "taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987).

## ANALYSIS

### I. LIABILITY

To find a taking for which liability would arise under the Fifth Amendment in a rails-to-trails case, the court must perform a three-part analysis specified by the Federal Circuit in *Preseault v. United States*, 100 F.3d 1525 (Fed.Cir.1996) ("*Preseault II*"):

> (1) who owned the strips of land involved, specifically did the Railroad ... acquire only easements, or did it obtain fee simple estates;
>
> (2) if the Railroad acquired only easements, were the terms of the easements limited to use for railroad purposes, or did they include future use as public recreational trails; and
>
> (3) even if the grants of the Railroad's easements were broad enough to encompass recreational trails, had these easements terminated prior to the alleged taking so that the property owners at that time held fee simples unencumbered by the easements.

100 F.3d at 1533; *see also Ingram v. United States*, 105 Fed.Cl. 518, 534 (2012); *Long-necker Property v. United States*, 105 Fed.Cl. 393, 405 (2012); *Beres v. United States*, 104 Fed.Cl. 408, 423–24 (2012); *Jenkins v. United States*, 102 Fed.Cl. 598, 605 (2011). To prevail, plaintiffs must demonstrate that the railroad held only an easement (as contrasted to a fee simple estate) on their property, and that either the easement did not encompass future use as public recreational trails, or that the easement had terminated prior to the alleged taking.

### A. *Easements*

An initial aspect of the *Preseault II* inquiry can be dispatched with alacrity. The parties have stipulated that the original grant from the federal government to Utah Southern Railroad Company consisted of an easement under the 1875 Act, and that Union Pacific obtained the easement as the successor-in-interest to Utah Southern Railroad Company. Stips. ¶¶ 2–5. Thus, Union Pacific acquired an easement while the plaintiffs retained the fee, and the court must proceed to the other steps of the *Preseault* analysis.

### B. *Limited Use for Railroad Purposes*

 If the easement granted under the 1875 Act was limited to railroad purposes and its scope does not include recreational trail use upon issuance of a NITU, then a taking will be established. *See Ladd v. United States*, 630 F.3d 1015, 1019 (Fed.Cir.2010) ("It is settled law that a Fifth Amendment taking occurs in Rails–to–Trails cases when government action destroys state-defined property rights by converting a railway easement to a recreational trail, *if trail use is outside the scope of the original railway easement*." (emphasis added)). The government contends that recreational trail use falls within the scope of the easement granted in this case for railroad purposes. Def.'s Cross–Mot. at 14. In this instance, to determine the bounds of the easement, the court looks to federal, not state, law, as the easement was granted under a federal statute.

The easement granted to Utah Southern Railroad Company was dependent upon the terms of the 1875 Act, which provides in relevant part:

> The right of way through the public lands of the United States is granted to any railroad company ... to the extent of one hundred feet on each side of the central line of said road; also the right to take, from the public lands adjacent to the line of said road, material, earth, stone, and timber necessary for the construction of said railroad; also ground adjacent to such right of way for station buildings, depots, machine shops, side tracks, turnouts, and water stations, not to exceed in amount twenty acres for each station, to the extent of one station for each ten miles of its road.

43 U.S.C. § 934.[5] This statutory text delineates the contours of the grant with specificity. Given the location and existence of a "central line" of a railroad, the easement extended one hundred feet on either side of the line. Use of material, earth, stone, and timber on the easement-burdened property was restricted to the amount necessary for the construction of the railroad itself. Allowances were made for other railroad-related structures, specifically station buildings, depots, machine shops, side tracks, turnouts, and water stations, but for no other type of activity. Additionally, railroad use could not hinder the utility of other modes of transportation. The 1875 Act set out explicit limitations in that regard:

> And the location of such right of way through any canyon, pass, or defile shall not cause the disuse of any wagon or other public highway located therein on March 3, 1875, nor prevent the location through the same of any such wagon road or highway where such road or highway may be necessary for the public accommodation; and where any change in the location of such wagon road is necessary to permit the passage of such railroad through any canyon, pass, or defile, said railroad company shall before entering upon the ground occupied by such wagon road, cause the same to be reconstructed at its own expense in the most favorable location, and in as perfect a manner as the original road . . . .

43 U.S.C. § 935.[6] Railroads thus were distinguished from other throughways such as wagon roads and made subservient to them.

In sum, the text of the 1875 Act implies the grant of a narrow and specific easement for railroad purposes only. *See Beres,* 104 Fed. Cl. at 448 ("Other than the uses specifically enumerated by Congress for the newly created railroad easements, the 1875 Act did not suggest any additional purposes beyond railroad purposes."). Moreover, the absence of reference to anything akin to a recreation-

al trail, coupled with the explicit subordination of the railroad easement to other more historically relevant modes of travel such as wagon roads, leads to the conclusion that public recreational trails were not encompassed in these grants. *Id.* ("Nothing in the words of [the 1875 Act] allowed for the expansion of the railroad easement granted in the 1875 Act to uses like public recreational trails. Nor can Congress' intention in drafting [the Act] be seen as incorporating public recreational trails into the scope of the 1875 Act grants.").

The 1875 Act was passed at a time when the federal government was especially concerned with easing and enabling means of travel to and settlement of the Western United States. *See Railway Co. v. Alling,* 99 U.S. 463, 480, 25 L.Ed. 438 (1878) ("*Denver & Rio Grande Ry.*") ("At the time of the passage of [the 1875 Act] Congress had become convinced of the importance to the country, and particularly to the Western States, of preserving cañons, passes, and defiles in the public domain for the equal and common use of all railroad companies organized under competent State or territorial authority, and to which might be granted by national authority the right of way."); *Great N. Ry. v. United States,* 315 U.S. 262, 272, 62 S.Ct. 529, 86 L.Ed. 836 (1942) ("The [1875] Act was designed to permit the construction of railroads through the public lands and thus enhance their value and hasten their settlement."); *see also Hash v. United States,* 403 F.3d 1308, 1311 (Fed.Cir.2005) (noting that the 1875 Act was enacted roughly concurrently with the Homestead Act, 43 U.S.C. § 161 (repealed, Pub.L. No. 94–579, tit. VII, § 702, 90 Stat. 2787 (1976)), designed to encourage western settlement).

A reading of the 1875 Act as limited to railroad purposes is in keeping with statements made at the time of its passage. For example, while discussing and amending the Senate version of the 1875 Act, Senator Stewart of Nevada stated, "If [railroad com-

---

**5.** Section 934 was repealed by Pub.L. No. 94–579, tit. VII, § 706(a), 90 Stat. 2793, regarding rights of way over, upon, under, and through the public lands and lands in the National Forest Systems.

**6.** Section 935 was also repealed by Pub.L. No. 94–579, tit. VII, § 706(a), 90 Stat. 2793, regarding rights-of-way over, upon, under, and through the public lands and lands in the National Forest Systems.

panies] do not build a railroad and do not use [the easement] for that purpose, they do not have it at all. The title is for this purpose." 2 Cong. Rec. 2900 (Apr. 8, 1874). As such, 1875 Act easements must be limited to the purposes described in the Act itself, commensurate with Congress's intent to provide for transportation across states. This is a purpose inconsistent with use of that same land as a recreational trail, the central purpose of which is to provide a venue for healthful exercise and enjoyment of the outdoor environment rather than conveyance of persons or goods. *See Beres*, 104 Fed.Cl. at 448 ("Even strictly construed against the original grantee, an expansive reading to include public recreational trails in the scope of the 1875 Act grant would appear to defeat the Congressional intent to make public lands available to railroad companies for the purpose of constructing railway lines." (citing *Great Northern Ry.*, 315 U.S. at 273–74, 62 S.Ct. 529; *Denver & Rio Grande Ry.*, 99 U.S. at 480)); *Toews v. United States*, 376 F.3d 1371, 1376 (Fed.Cir.2004) ("[I]t appears beyond cavil that use of these easements for a recreational trail—for walking, hiking, biking, picnicking, frisbee playing, with newly-added tarmac pavement, park benches, occasional billboards, and fences to enclose the trailway—is not the same use made by a railroad, involving tracks, depots, and the running of trains.").

The government has countered that trail use and rail-banking do, in fact, serve the same purposes as railroads. It cites a decision of the Supreme Court of Utah for the proposition that a rail corridor preservation project "provides for the 'transportation needs of the 21st Century' including 'national and interregional personal mobility (including personal mobility in rural and urban areas) and reduced congestion.'" Def.'s Cross–Mot. at 24 (citing *Weiser v. Union Pac. R.R.*, 247 P.3d 357, 369 (Utah 2010)) (internal citations omitted). Nonetheless, "interregional personal mobility" is not the same as the conveyance of persons or goods by rail. Because the easement here was granted under federal law and not according to state property law, its scope must be analyzed using the federal statute. *See Beres*, 104 Fed.Cl. at 444 ("[T]o determine the scope of the easements for the 1875 Act cases, the court applies federal law."). An examination of the text of the 1875 Act, the intent of Congress in enacting it, and all attendant case law confirms emphatically that easements such as the one possessed by Union Pacific have a narrow compass that excludes use as a recreational trail. *Beres*, 104 Fed.Cl. at 454 ("[T]he scope of [an] 1875 Act easement[ is] exceeded by the conversion to a public recreational trail.").

The government has also contended that rail-banking is itself a railroad purpose. Def.'s Cross–Mot. at 25. However, the existence of rail-banking, even if it may be sufficient to rescue the easement from abandonment through operation of state law, is not enough to insulate the government from a takings claim. Abandonment of the easement is not at issue here; in fact, the court need not determine when, or even whether, the line was abandoned to find that the government has committed a taking. *See Ellamae Phillips Co. v. United States*, 99 Fed.Cl. 483, 486 (2011) ("We find that trail use is outside the scope of the easement granted by the 1875 Act, irrespective of the existence of railbanking.").[7] What is important to the court's analysis, rather, is whether the NITU authorized use of easements *exceeding* that for railroad purposes. Under the test established in *Preseault II*, step three, which concerns termination of the easement, need only be reached if the easement in question is sufficiently broad to encompass trail use. *Preseault II*, 100 F.3d at 1552 ("[I]f the terms of the easement when first granted are broad enough under then-existing state law to encompass trail use, the servient estate holder would not be in a position to complain about the use of the easement for a permitted purpose."). Because easements granted under the 1875 Act are not so broad, the court's inquiry need not touch upon the ques-

7. Given the fact that the railroad had languished unused for at least two years by the date of the NITU and that by the time of suit, the land had already been converted to a functional recreational trail, abandonment would have occurred but for operation of Section 8 of the Trails Act, 16 U.S.C. § 1247(d), quoted *supra*, at 3 n. 3.

tion of pre-NITU abandonment at this stage. The NITU mechanism, even as it preserves the continued existence of the easement, points to the government's liability for transforming the purpose of the easement beyond the recognition or contemplation of its originator.

Next, the government urges that Union Pacific's pre-NITU sale of the passenger easement to UTA in what is commonly called a *State of Maine* transaction somehow preempted the government's liability when STB issued the NITU. *See* Def.'s Cross–Mot. at 14. This contention is premised on the postulate that the passenger easement thus conveyed was still in effect and would continue to burden the plaintiffs' property regardless of the NITU; any nonconforming use of that easement was undertaken by UTA, and not the federal government once the easement changed hands. *Id.* Because UTA ultimately constructed and now maintains the recreational trail in the corridor, the government claims that its issuance of the NITU neither called for nor implemented recreational trail use. Once again, however, the government's argument is unavailing. Union Pacific could not convey more than it possessed: a railroad purposes easement limited by the terms of the 1875 Act which granted it. Without the NITU, neither Union Pacific nor UTA could have transformed the property into a recreational trail, nor could they have acted without STB's authorization to take advantage of rail-banking and forestall reversion to the plaintiffs. Although the entitlement may partially have changed hands when Union Pacific sold a portion of the easement to UTA, that sale did not expand the scope of that easement. The power to do so resided with the federal government acting through the STB. That power was exercised by the government on December 31, 2002, when it issued the NITU. The *State of Maine* transaction did not and, indeed, could not have affected the scope of the easement under the 1875 Act or the power of the government to control or alter it. The government may not sidestep responsibility by pointing to the role of UTA in creating the

physical trail. *See, e.g., Toews v. United States,* 376 F.3d at 1381–82 ("[W]hen the Federal Government puts into play a series of events which result in a taking of private property, the fact that the Government acts through a state agent does not absolve it from the responsibility, and the consequences, of its actions." (quoting *Preseault II,* 100 F.3d at 1551)); *Sutton v. United States,* 107 Fed.Cl. 436, 440 (Oct.2012) ("[The government] is responsible not only for its immediate actions but also for the consequences of its actions in the takings arena."). The agent of the transformation from rail to trail is the federal government, whose authorization enabled UTA to convert the railroad corridor to trail use. Consequently, partial summary judgment will be granted, holding the federal government liable to those plaintiffs who have established or will establish their ownership of underlying fee interests in the corridor.

## C. *Ownership of the Underlying Fee*

A qualifying plaintiff must have owned pertinent property on the date of the taking. In cases such as this, the date of the taking is identified as "when state law reversionary property interests that would otherwise vest in the adjacent landowners are blocked from so vesting.... [T]his occurs when the railroad and trail operator communicate to the STB their intention to negotiate a trail use agreement and the agency issues a NITU." *Caldwell v. United States,* 391 F.3d 1226, 1233 (Fed.Cir.2004); *see also Barclay v. United States,* 443 F.3d 1368, 1373 (Fed.Cir. 2006) ("Thus, a Trails Act taking begins and a takings claim accrues, if at all, on issuance of the NITU."). For these reasons, the date of the taking is December 31, 2002, when the NITU was served and the rail-banking mechanism went into effect, thus circumventing any possibility of the plaintiffs' property rights vesting. Most of the claims enumerated in the Claims Book have been accepted by the government without objection. *See* Def.'s Objections, ECF No. 46. Ownership of a few relevant properties remains at issue.[8]

8. Ownership of parcels was complicated by a number of transactions that occurred because the area of the rail line has been under development. *See* Hr'g Tr. 5:18–20 ("[T]here was a lot of development going on. There were different

### 1. *Claim Numbers 7 and 15.*

At the hearing on October 2, 2012, plaintiffs' counsel conceded that further investigation had revealed that two particular claims contested by the government are not in fact proper. The claims are No. 7, the Mountain Home Development claim, and No. 15, the Gary Yates claim. Hr'g Tr. at 3:24–4:16. As such, Claim Nos. 7 and 15 shall be excluded from further consideration by the court and are dismissed, with one adjustment related to Claim No. 7. Both parties agree that one parcel was not properly grouped with the other parcels encompassed by that claim. Parcel No. 65–248–0003, originally identified as belonging to Mountain Home Development Corporation in the Claims Book, was actually owned by plaintiff Fox Ridge Investments, LLC on the NITU date. Def.'s Reply at 5, n. 1. As a result, Parcel No. 65–248–0003 should no longer be considered part of Claim No. 7, and a claim respecting that particular parcel is not dismissed in conjunction with those of the other parcels covered by that claim. During briefing, the parties disagreed as to the legitimacy of a claim on Parcel No. 65–248–0003, with the government claiming that at the time the NITU was issued, the property was segregated from the right-of-way by a road. *See* Def.'s Cross–Mot. at 12. However, prior to the hearing, the parties resolved this disagreement, and now both the government and plaintiffs concur that the road in question did not exist until *after* the NITU issued. *See* Pl.'s Reply at 12; Def.'s Reply at 5. Accordingly, Parcel No. 65–248–0003 is no longer a part of Claim No. 7, and a claim respecting that parcel survives as part of property belonging to plaintiff Fox Ridge Investments, LLC.

### 2. *Claim Number 11.*

With respect to Claim No. 11 (specifically Parcel No. 11–032–0369), the government argues that the named plaintiff related to that parcel ("The Point") did not hold clear title to the parcel on December 31, 2002. *See* Def.'s Cross–Mot. at 12; Def.'s Reply at 5–6. Both parties agree on the basic facts of The Point's history relative to Parcel No. 11–032–0369. The Point obtained Parcel No. 11–032–0369 through a trust deed naming First American Title Insurance Agency ("First American") as the trustee. Def.'s Reply at 5–6. Prior to the date of the NITU, The Point defaulted on the financing note, *prompting issuance of a notice of default.* After the NITU was issued, First American disposed of the parcel through a forced sale. *Id.;* Hr'g Tr. at 7:4–20. The parties differ on the ownership of Parcel No. 11–032–0369 between the time The Point defaulted on its note and the time that the parcel was sold by First American. Under plaintiffs' view, The Point retained title to the property throughout the default process, up to the day of the forced sale. *See* Pls.' Reply at 13. The government, however, posits that when The Point defaulted on its financing note, the trustee (First American) became the rightful owner of the parcel. *See* Def.'s Reply at 6. Because the NITU was issued during this crucial time period, it will be necessary to determine the proper plaintiff for Claim No. 11. Resolution of that issue requires reference to Utah property law and will require additional development of the chain of title and the contractual terms of the trust deed between The Point and First American. Consequently, the court remits for trial the ownership question respecting the parcel involved with Claim No. 11.

### 3. *Claim Number 14.*

Claim No. 14 has also been contested by the parties. This claim, now consisting of three separate parcels, has a somewhat murky history. Claims Book at 3. When the Claims Book was first issued to the government, plaintiffs asserted that Claim No. 14 was owned entirely by Wilmar Investments, LC ("Wilmar"). *Id.* However, the government has challenged Wilmar's ownership of one of the three parcels, Parcel No. 11–032–0261, asserting instead that an individual named Wayne Siggard was the actual owner on the NITU date. Def.'s Reply at 7. The government bases this objection upon a quitclaim deed executed in September 2001, which it claims is in the parcel's chain of title. This deed purports to convey the parcel to Mr. Siggard from Thanksgiving Entertain-

parties coming in and out of the picture as they were developing the property.").

ment and Shopping Center, L.L.C. ("Thanksgiving Entertainment"). Def.'s PFF, Ex. 8 (Quit–Claim deed from Thanksgiving Entertainment to Wayne Siggard (Sept. 19, 2001)) ("Siggard Deed"). The Siggard Deed, however, does not refer to any particular parcel number; rather, it describes three separate parcels by measurements and landmarks. Siggard Deed, Ex. A.

The government claims that the Siggard Deed describes in part the same property as that identified in the Claims Book as Parcel No. 11–032–0261. Def.'s Resp. to Pls.' Supplemental Proposed Findings of Uncontroverted Facts ("Def.'s Resp. to Pls.' Supplemental Findings"), ECF No. 64, ¶¶ 10–11. On the date of the Siggard Deed's execution, Parcel No. 11–032–0261 was part of a larger parcel, Parcel No. 11–032–0018. *Id.* ¶ 11. According to the government, the Siggard Deed appears in the chain of title for, and therefore conveyed, Parcel No. 11–032–0018, as well as 11–032–0040 and 11–032–0050 prior to the NITU date. *Id.* ¶ 10. Although the government admits that Wilmar acquired Parcel No. 11–032–0018 from William and Mary Farley on September 30, 1996, it asserts that the Siggard Deed evidences the fact that Wilmar did not continue to hold the parcel and did not hold it on the NITU date. *Id.* ¶ 13.

Notably, the quit-claim transfer from Thanksgiving Entertainment to Wayne Siggard made no mention of Wilmar whatsoever, and was executed on September 20, 2001, nearly a year and one-half before the NITU was issued and just under five years after Wilmar originally acquired the property from William and Mary Farley. In addition, the quit-claim deed from Thanksgiving Entertainment does not specify that an unencumbered fee is being transferred. Accordingly, although the government avers that Wayne Siggard, and not Wilmar, was the actual owner of Parcel No. 11–032–061 (at that time subsumed by Parcel No. 11–032–0018) on the date of the taking, Def.'s PFF ¶ B.32, the court has no indication of any particular interest in the parcel that Thanksgiving Entertainment may have had and Mr. Siggard may have gained. In all events, Wayne Siggard is not currently a member of the plaintiff class

and his name does not appear attendant to any claims currently in the Claims Book. *See* Claims Book.

Plaintiffs counter that the Siggard Deed does not in fact describe Parcel No. 11–032–0261, or even any larger parcel which may have at one time encompassed that tract. *See* Pl.'s Reply at 14–15. Rather, plaintiffs assert that the Siggard Deed pertains to a totally distinct but adjacent lot comprised of the two other parcels referenced by the government: Parcel Nos. 11–032–0050 and 11–032–0040. *Id.,* referencing Pls.' Resp. to Def.'s Proposed Findings of Uncontroverted Facts and Pl.'s Supplemental Proposed Findings of Uncontroverted Facts ("Pls.' Supplemental Findings"), ECF No. 58, Ex. G. The actual location of Parcel No. 11–032–0261, according to plaintiffs, is a piece of land bordering the property described in the Siggard Deed, but not contained within it. Plaintiffs further contend that on the date of the NITU, Parcel No. 11–032–0261 did not yet exist because it was a part of a single larger parcel (Parcel No. 11–032–0018) that was split into three separate parcels at a later date, one of which became what is now identified as Parcel No. 11–032–0261. Pls.' Supplemental Findings, Ex. E. Neither Parcel No. 11–032–0261 nor its predecessor appear to have overlapped with Parcel Nos. 11–032–0050 or 11–032–0040 at any time, according to the maps produced by the plaintiffs. Under plaintiffs' reading of the Siggard Deed, no cloud exists on Wilmar's title to any of the three parcels contained in Claim No. 14. Further, plaintiffs assert that the two genuine Siggard Deed parcels have since changed hands and are no longer the sole property of Wayne Siggard. Rather, plaintiffs claim that the Siggard Deed property is now owned 26.67 percent by Wilmar and 4.44166 percent by The Point II (already a class member and claimant on other parcels), with the remainder of the property distributed at "various percentages" among the members of the Siggard family. Pls.' Reply at 15.

The parties' contest regarding Claim No. 14 demonstrates an evident dispute of genuine fact. The extensive development of this physical area in question, resulting in the splitting and transfer of parcels over the

course of several decades, has contributed to the apparent uncertainty about ownership of the parcel(s) involved in Claim No. 14. Absent a further stipulation of fact, ownership of the parcel(s) must be resolved at trial. Summary judgment as to the proper claimants for Claim No. 14, as well as for Parcels No. 11–032–0050 and 11–032–0040 (if such parcels are in fact distinct from those already listed in Claim No. 14) is denied.

## II. REOPENING THE PLAINTIFF CLASS

The Siggard Deed raises the possibility that previously unknown potential plaintiffs, namely seven members of the Siggard family (including Wayne Siggard) may hold title either to some of the parcels included in Claim No. 14, or to portions of Parcel Nos. 11–032–0050 and 11–032–0040. Def.'s Reply at 8. During briefing, plaintiffs requested reopening the class to give notice to, and potentially to admit, these newly discovered plaintiffs. That request was reiterated by a formal motion made at the hearing. Hr'g Tr. at 21:4–9. The government has opposed this motion, complaining that it is based upon "information which was not previously disclosed to [the government] despite that information being responsive to outstanding discovery requests." Def.'s Reply at 2. At the hearing on the cross-motions, plaintiffs explained that the Siggard Deed was a freestanding quit-claim transfer that did not appear in any other chain of title for the relevant parcels and that complexities of the deeds associated with active developmental efforts had obscured the Siggard Deed from initial discovery. Hr'g Tr. at 20:5–11 ("And, frankly, I did not know about those other owners until the Defendant raised the issue about—the [Siggard Deed. Raising the issue] was helpful because it caused me to go back to the county out there and follow up. And what I found was that there were these other interests on these two parcels."). Having itself reviewed property records in this case, the court is inclined to agree with plaintiffs that the complexities of the land transfers in this case complicated identifying current owners and parcel numbers which may lead to claimants. In fact, at the hearing, counsel for the government acknowledged that "it's

very complex title history," commenting that to sort out the true owners of these parcels, "I think we're going to need some kind of expert analysis." Hr'g Tr. at 29:15–18. In a scenario where expert analysis is required to sort out who owns what, the court is not surprised that a potential plaintiff (or even seven) may have been overlooked in the efforts to locate potential members of the class. The plaintiffs' reasoning for having missed the Siggard family during the initial open-class period is persuasive.

■ As a further ground for opposing any reopening of the class, the government argues that the six-year statute of limitations set out at 28 U.S.C. § 2501 precludes the court from admitting new class members. Hr'g Tr. at 36:4–6. This argument bears many similarities to one which the government made and lost at the class-certification stage of this proceeding. *See Geneva Rock Prods.*, 100 Fed.Cl. at 783–86 (holding that the class-action allegations in Geneva Rock's complaint were sufficient to toll the statute of limitations for the duration of the opt-in period). Further, once certified, the court is explicitly authorized by rule to reopen the class before judgment. RCFC 23(c)(1)(C) (providing that "[a]n order that grants or denies class certification may be altered or amended before final judgment"). RCFC 23 follows the pattern and text of Fed.R.Civ.P. 23, with the exception that this court's rule allows only opt-in class actions rather than also permitting opt-out class actions as does Fed.R.Civ.P. 23. *See* RCFC 23 Rules Committee Note, 2002 revision. Notwithstanding this major exception, the text of RCFC 23(c)(1)(C) is identical to that of Fed.R.Civ.P. 23(c)(1)(C). And, the circumstances at hand in this case were anticipated by a commentary in the Advisory Committee Notes to the 2003 amendments to Fed.R.Civ.P. 23(c), which introduced the current text of the rule. That commentary stated that "[i]f the definition of a class certified under Rule 23(b)(3) is altered to include members who have not been afforded notice and an opportunity to request exclusion, notice—including an opportunity to request exclusion—must be directed to the new class members under Rule 23(c)(2)(B)." Fed.R.Civ.P. 23 advisory com-

mittee's note, 2003 revision. The recent discovery that the Siggard family probably owned interests in qualifying property on the date of the taking fits squarely within the circumstances described in the Advisory Committee's note regarding the text of Fed. R.Civ.P. 23(c)(1)(C). Accordingly, the court shall reopen the class to provide that members of the Siggard family be given notice and the opportunity to opt into the class as plaintiffs.

## III. MEASURING DAMAGES

The Fifth Amendment provides for "just compensation" when private property is taken for public use. U.S. Const. amend. V. To determine "just compensation" here, the court must calculate the difference between what plaintiffs had before the taking by the issuance of the NITU and what they were left with afterward. *See Otay Mesa Prop., L.P. v. United States,* 670 F.3d 1358, 1364 (Fed.Cir.2012) ("Where the property interest permanently taken is an easement, the 'conventional' method of valuation is the 'before-and-after' method.").

The "after" is uncontested: after the NITU issued, each plaintiff had property burdened by a general easement permitting recreational trail use with the potential for future railway use by way of rail-banking. Each plaintiff's "after" value may be appraised according to the pertinent parcel size and location. The "before" value is contested. Plaintiffs believe that a proper "before" value can be arrived at by calculating the property's value unencumbered by any rail or trail easements. Pls.' Mem. at 30. Contrastingly, the government considers that the "before" value should be the value of the property still burdened by UTA's passenger rail easement and Union Pacific's freight easement, plus easements for utilities. Def.'s Cross–Mot. at 26. In short, under the government's view, plaintiffs would only be entitled to the diminution in value to their property caused by the elements of the easement which exceed the original 1875 Act railroad-purpose easement.

To support their belief that damages must be calculated using burdened property as the basis, the government points to two cases.

The government cites to *Vereda, Ltda. v. United States,* 271 F.3d 1367, 1375 (Fed.Cir. 2001), and *Joshua v. United States,* 17 F.3d 378, 380 (Fed.Cir.1994), for the proposition that this court may not review and reverse findings of the STB. Def.'s Cross–Mot at 26. The government's reliance on these two cases is problematic, as neither relates to a subject matter similar to the case at hand. *Vereda* discusses the court's lack of jurisdiction in cases arising under the Controlled Substances Act, 21 U.S.C. § 881, while *Joshua* confirms this court's lack of jurisdiction to review the decisions of district courts. In its briefing, the government does not specify the STB "findings" of concern, and the court's review of all supplemental materials in this case has not revealed any findings which would serve to bind the court on this issue. In fact, representations made to the STB by Union Pacific during the NITU process reinforce the plaintiffs' position that they had interests in the right-of-way which should have reverted absent government interference. *See* Pls.' PFF, Ex. A (Notice of Exemption), at 6 ("Based on information in [Union Pacific's] possession, the Line proposed for abandonment does contain federally granted right-of-way. Portions of the right-of-way are subject to *reversionary interests.*") (emphasis added). In the NITU, the STB indicates that Union Pacific's abandonment exemption should be "modified to the extent necessary to implement trail use/rail banking." *Id.,* Ex. C (NITU), at 2. In short, the STB's decision undermines, rather than supports, the government's position. The NITU expressly modifies Union Pacific's abandonment through the rail-banking procedure. Without such modification (made possible by the Trails Act), abandonment would have taken place, and the plaintiffs would have been entitled to the reversionary interests Union Pacific knew they had. The Board's action forestalling abandonment through rail-banking stems from the authority of the Trails Act, and it is not a final administrative disposition of the property's "before" condition.

Alternatively, the government argues that, even if a taking did occur, it did not encompass the entire swath of property claimed by

the plaintiffs. Rather, the government asserts that the taking should be limited to the 25–foot wide strip which constituted the freight easement still owned by Union Pacific at the time of the NITU. Hr'g Tr. 71:15–72:4. In short, as the government would have it, plaintiffs are only entitled to recover for diminution of property contained within the 25–foot wide strip, and that freight-easement area is the only part of plaintiffs' property which should be included in a damages calculation. As a factual matter, the STB stated in granting Union Pacific's petition for an abandonment exemption that "[t]he retained [freight] easement will expire upon consummation of the instant abandonment exemption." Def.'s PFF, Ex. 4 (Notice of Union Pacific's request for an abandonment exemption), at 1. Nonetheless, the STB's decision in effect allowed all common-carrier rail use in the corridor to be abandoned, absent rail-banking. Because the NITU authorized trail use in lieu of common-carrier rail use on the entirety of the original 1875 Act easement, the plaintiffs' damages must be measured based on the entirety of the easement granted under the 1875 Act.

Plaintiffs' position is that the "before" state of their property should be one unencumbered by rail or trail easements, because that is what they would have held absent the Trails Act. Pls.' Mem. at 25. Plaintiffs base this assertion on a "state law reversionary right to unencumbered land." *Id.* (internal quotes removed); *see Ybanez v. United States*, 102 Fed.Cl. 82, 87 (2011) ("The determination of what was taken from plaintiffs turns not on the status of the land at the time of the NITU but what interest plaintiffs would have had in the absence of the NITU."); *Rogers v. United States*, 101 Fed. Cl. 287, 293 (2011) ("[The] combined blocking of state law abandonment and imposition of a new easement [by the NITU] constitutes the taking .... [T]he Trails Act would have blocked an abandonment of the railroad easement and prevented the fee simple, unencumbered by that railroad easement, from reverting to Plaintiffs.") To determine whether reversion would have occurred, the court ordinarily looks to the original grant of the easement through a lens of state law principles. *See Macy Elevator, Inc. v. Unit-*

*ed States*, 105 Fed.Cl. 195, 200 (2012) (evaluating the "before" condition of plaintiffs' property according to whether the respective easements were granted through determinable deeds, condemnation, or adverse possession, in accord with Indiana law); *Jenkins v. United States*, 102 Fed.Cl. 598, 613–19 (2011) (stating that plaintiffs were entitled to recover the value of their property as if reversionary interest rules of Iowa law had taken effect); *Rogers*, 101 Fed.Cl. at 295–96 (holding that the "before" condition of the property was unencumbered by the original easement in accord with Florida contract principles, rather than Florida abandonment common law).

◼ Plaintiffs allege that, pursuant to Utah state law, the 1875 easement would have terminated when Union Pacific ceased operation of a railroad over the property and took steps demonstrating abandonment. Am. Compl. ¶ 27; Pls.' Reply at 5 ("If the federal government had not passed the Trails Act, then what would have occurred naturally is that the landowners would have gotten their land back when [Union Pacific] wanted to abandon this line."). The plaintiffs are correct. Under Utah law, an easement is abandoned when non-use is coupled with the actual intent to abandon the easement. *Western Gateway Storage Co. v. Treseder*, 567 P.2d 181, 182 (Utah 1977). Both factors are present here. As noted by Union Pacific and UTA during the process of negotiating the NITU, by 2002, the rail line had sat unused for at least two years. Pls.' PFF, Ex. B (Letter Requesting Issuance of NITU). Further, Union Pacific evinced its actual intent to abandon the easement quite literally, in the form of its request for an abandonment exemption. If negotiations with UTA had fallen through and the parties had failed to reach an agreement satisfying the NITU requirements, that request for exemption would not have been modified by the STB, but would have taken effect on January 1, 2003. Pls.' PFF, Ex. C (NITU). The easement would have terminated through abandonment, leaving plaintiffs with unburdened property, but for the Trails Act, the NITU, and the rail-banking provision. Whether Utah law applies to abandonment, or federal law would "borrow" Utah law

when addressing abandonment of an easement granted under the 1875 Act, the true "before" state of the plaintiffs' property absent federal intervention through action of the STB would have been a fee unencumbered by rail or trail easements. Damages should therefore be calculated using the value of plaintiffs' property in unencumbered condition.

## CONCLUSION

For the reasons stated, the government is liable to plaintiffs for a taking of property on December 31, 2002, upon issuance of the NITU. Further, the plaintiff class is reopened to give notice to, and potentially to admit to the class of plaintiffs, the newly discovered Siggard property owners.[9] Respecting the current plaintiffs' claims, Claim Nos. 7 (with the exception of Parcel No. 65–248–0003) and 15 shall be dismissed. Ownership of contested Claim Nos. 11 and 14 is reserved for trial. The government shall be liable on the remaining claims, ownership of which is conceded to an identified plaintiff or plaintiffs on the date of the taking. Damages shall be determined by measuring the decrease in value of plaintiffs' property due to the burden of the trail easement, using the unencumbered fee as the baseline.

It is so **ORDERED.**

---

9. Plaintiffs shall give notice to these owners on or before December 15, 2012, and the Siggard owners shall have until January 21, 2013, to indicate whether they wish to opt into the class of plaintiffs. Plaintiffs shall file an amended complaint on or before February 11, 2013, if any Siggard owners choose to opt into the class.